UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert CRAIG, Frank P. North, Jr.,
Peter V. Pappas and Jack E. Walker,
Defendants-Appellants.

Nos. 76–2089, 76–2090, 76–2092
and 76–2093.

United States Court of Appeals,
Seventh Circuit.

Argued June 16, 1977.

Decided Dec. 12, 1977.

Rehearing and Rehearing In Banc
Denied March 21, 1978.

William A. Barnett, Charles R. Purcell, Peter V. Pappas, William J. Nellis, Anna R. Lavin, Chicago, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., James F. Holderman, John S. Gleason, III, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT and CUMMINGS, Circuit Judges, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

In December, 1974, fifteen persons were charged in various counts of a fourteen count indictment. Count One charged the defendants with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. Counts Two through Twelve charged the substantive crime of mail fraud in violation of 18 U.S.C. § 1341, alleging that the defendants and unindicted co-conspirators devised a scheme and artifice to "defraud the citizens of the State of Illinois of their right to the loyal, faithful, and honest services of those defendants and co-conspirators . . who were public officers and members of the Illinois General Assembly . . . in the performance of acts related to their official duties and functions." Counts Two through Twelve also alleged that the defendants devised a scheme to "defraud the State of Illinois, its citizens, its public officers, its public employees and the loyal, faithful and honest members of the Illinois General Assembly of their right to have the State's legislative business conducted honestly and impartially, and in accordance with the laws of Illinois, free from deceit, corruption, misconduct, conflict of interest, bribery and fraud, and willful concealment thereof." Each of Counts Two through Twelve alleged that the various defendants and co-schemers caused a specific mailing to be made for the purposes of executing the scheme. Each of Counts Two through Twelve are also alleged to be overt acts of the conspiracy charged in Count One. Counts Thirteen and Fourteen charged a violation of 18 U.S.C. § 1951, alleging that the various defendants caused an individual to travel in interstate commerce with intent to promote an unlawful activity, namely bribery in violation of *Illinois Revised Statutes*, Chapter 38, § 33–1.

Prior to trial seven defendants entered pleas of guilty to Count One, and the other charges against them were dismissed. Eight defendants stood trial. Following a jury trial that lasted over two months, six defendants were found guilty, and two were acquitted. The proceedings and disposition as to each defendant are set forth in the margin.[1]

* Senior District Judge William J. Campbell of the United States District Court for the Northern District of Illinois is sitting by designation.

1. 

| DEFENDANTS | PROCEEDING | VERDICT | SENTENCE |
|---|---|---|---|
| A. *Elected Officials* | | | |
| Robert Craig | Trial | Guilty, as charged | 3 years, $5000. |
| Frank P. North | Trial | Guilty, Ct. 1. 10–12 | 3 years, $5000. |
| Donald D. Carpentier | Plea | | 3 years, $5000. |
| Kenneth Course | Trial | Guilty, as charged | 3 years, $5000. |
| Louis Capuzi | Trial | Guilty, as charged | Acquitted/Post Trial |
| John Wall | Trial | Not Guilty | |
| Jack Walker | Trial | Guilty, as charged | 3 years, $5000. |
| B. *Employee/Ill. Secy. of State* | | | |
| Peter V. Pappas | Trial | Guilty, as charged | 5 years, $10,000. |
| C. *Ready-Mix Industry Representatives* | | | |
| Bernard Arquilla | Plea | | 2 year Probation, fine |
| Jack Chalden | Plea | | 2 year Probation, fine |
| Herbert Craig | Plea | | 2 year Probation, fine |
| Arnold Moeller | Plea | | Deceased |
| Merlin Wille | Plea | | 1 year Probation |
| John Edmier | Plea | | 1 year Probation |
| Francis Sheahan | Trial | Not Guilty | |

## I. FACTS [2]

In the six county metropolitan Chicago area, a trade association known as the Northern Illinois Ready-Mix and Materials Association (NIRMMA) represented the interest of the ready-mix cement industry. For many years prior to the events which formed the basis of this prosecution, NIRMMA, through its Transportation Committee, was desirous of increasing by one cubic yard [3] per truck the amount of ready-mix cement which industry trucks could legitimately haul on Illinois roads.

The Board of Directors of NIRMMA held a meeting in Chicago on October 20, 1971. At this meeting, James McBride,[4] an employee of Material Service Corporation and an unindicted co-conspirator, informed the NIRMMA Board that the Illinois garbage hauling industry had just obtained weight relief for garbage trucks through the passage of legislation in the Illinois General Assembly, and that the time was right for the ready-mix cement industry to do likewise. McBride indicated that he knew an attorney, defendant Peter V. Pappas, who could assist the ready-mix industry in drafting their legislation for a $5,000.00 fee. McBride also stated at the meeting that Peter V. Pappas was very close to the Illinois Motor Vehicle Laws Commission—an important Commission in obtaining the passage of weight relief legislation—and that any such legislation would cost a considerable amount of money. Two NIRMMA Board members, Arnold Moeller of Meyer Material Company and Bernard Arquilla of Accurate Ready-Mix, estimated that the weight relief legislation could run as high as $100,000.00.

About one week after this meeting, McBride met with members of NIRMMA's Transportation Committee at the NIRMMA offices in Chicago. McBride informed the members that the assistance of Peter V. Pappas was necessary in procuring the desired weight relief legislation, and that an undisclosed amount of money would be required. Morris A. Lauwereins, an unindicted co-conspirator and co-chairman of the NIRMMA Transportation Committee, participated with other committee members in drawing up an agenda specifying what relief the industry desired, and instructed McBride to meet with Peter V. Pappas. In order to assure a state-wide effort for ready-mix truck weight relief, Lauwereins told other committee members to contact the downstate ready-mix association, known as the Illinois Division—Midwest Ready-Mix Concrete Association.

McBride, Merlin Wille, Lauwereins, and Tom Connolly, the Executive Secretary of NIRMMA—all of whom were associated with the ready-mix industry—met with Peter V. Pappas several days later in a private room at a Chicago hotel. Peter V. Pappas outlined the procedures to be followed in seeking weight relief legislation. After Lauwereins gave him the agenda specifying the relief sought by the industry, Peter V. Pappas stated that an unspecified amount of money would be required at a later time, and that his fee for drafting the proposed bill was $5,000.00.

The record demonstrates that sometime during the period from mid-October, 1971, to the early part of November, 1971, Peter V. Pappas spoke with Representative Pete Pappas,[5] a Republican member of the Illinois House of Representatives and a member of the Illinois Motor Vehicle Laws Com-

2. Based on our reading of the voluminous transcript of proceedings below, we find the government's statement of facts to be fair and accurate. Hence, our discussion of the facts is based primarily on the statement contained in the government's brief. In those instances in which the defendants have claimed that the government's statement of facts is at variance with the evidence adduced at trial, we have formulated our own statement where necessary.

3. The record indicates that one cubic yard of ready-mix material weighs about 4,000 lbs.

4. McBride was deceased at the time of trial.

5. Pete Pappas and Peter V. Pappas are not related. They will be referred to by these names throughout this opinion.

mission. Peter V. Pappas informed Pete Pappas of his meeting with the ready-mix industry people and stated "he thought he could get us some money for the passage of weight relief legislation." In answer to Peter V. Pappas' question as to how much it would take, Pete Pappas answered that he did not know, but would check and get back to Peter V. Pappas.

Pete Pappas testified that he then spoke with defendant Donald Carpentier, a Republican member of the Illinois Senate, and also a member of the Motor Vehicle Laws Commission. Pete Pappas testified that he told Carpentier that Peter V. Pappas had said "that there was a chance that we could get some money on weight relief from the ready-mix people," and had inquired of him as to how much it would take.

Pete Pappas further testified that later that same day he talked with defendant Robert Craig, a Democratic member of the Illinois House of Representatives. Pete Pappas told Craig that Peter V. Pappas had said "that there was a chance that we could get some money on the weight relief for the ready-mix industry." After reiterating to Craig that Peter V. Pappas had asked him how much it would take and that he answered him that he did not know, and that he had asked the same question of Carpentier and had received the same answer, Pete Pappas testified that he asked Craig: "Bob, if you have any idea as to how much money it would take to get it through?" Craig answered that he wasn't sure but would get back to him.

Pete Pappas further testified that Craig contacted him within a few days. A conversation ensued among Craig, Pete Pappas and Carpentier. Pete Pappas asked Craig if he had any figures or any idea how much it would take. Craig responded that he

thought he could get it through for "ten". Following Craig's lead, Pete Pappas and Carpentier each indicated that it would take "ten" to get the legislation through his side.[6] During this conversation, Craig indicated that the money would have to be paid as the bill passed each House. Carpentier was to handle the Republican side of the Senate; Craig, the Democratic side of the House; and Pete Pappas, the Republican side of the House. The three then discussed the need for a Democratic Senator to handle the bill on that side, and Pete Pappas indicated that he would talk with Senator Kenneth Course.

A few hours later, Pete Pappas spoke with Senator Course at Course's desk on the floor of the Illinois Senate. Pappas said, "Kenny, there is going to be some money on the cement bill and I just finished talking with Bob [Craig] and Don [Carpentier] and we are going to try and get ten for each side to get the bill through and I want to know if you would be willing to handle the Democratic side of the Senate." Course responded: "It is whatever you guys decide is fine with me." Pete Pappas advised Course that the money would be paid as the bill passed each House.

While these events took place in Springfield, Wille and Lauwereins met with representatives of the downstate ready-mix trade association, the Illinois Division—Midwest Ready-Mix Concrete Association (ID–MRCA), on October 30, 1971, at a restaurant in Bloomington, Illinois. Defendants Jack Chalden and Herbert Craig,[7] both associated with ID–MRCA, and Lou Marcy and Ed Sembel of other downstate concerns were told by Lauwereins that the time was right for ready-mix truck weight relief and that ID–MRCA and NIRMMA should join together in the effort because it would be expensive. Lauwereins also told the group

6. The testimony of Representative Pete Pappas reflects that the House chamber and the Senate chamber are each divided by aisles which run through the center of each respective chamber. The aisles divided each chamber into sides which were occupied along party lines. Thus, the Democratic side of the House, Republican side of the Senate, etc.

7. Defendant Herbert Craig is not related to defendant Robert Craig.

that it would be wise for a downstate spokesman to promote and carry through the bill. He indicated to the downstaters that there would be a $5,000.00 fee for drafting the bill, as well as other unidentified expenses.

On November 5, 1971, a luncheon meeting was held at a Chicago hotel. Present at this meeting were downstaters Chalden and Sembel and NIRMMA members Wille, Lauwereins, McBride, Connolly, one Wes Wiggington and one Bill Hendrickson. Lauwereins chaired the meeting, and introduced Peter V. Pappas to those present as the gentleman who could assist them in securing the legislation. Peter V. Pappas then informed the group that weight relief should be sought for ready-mix trucks only.[8] Peter V. Pappas also presented Tom Connolly of NIRMMA with two $2500.00 invoices for his drafting fee, and indicated that an undisclosed amount of money would be required at a later date, and that they "should be prepared to participate with campaign contributions and other legislative support." Some discussion ensued as to who would function as a conduit for the funds, but nothing was decided. According to Wille's testimony, Peter V. Pappas explained at the meeting that the bill he would draft "would appear to be very much a watered down bill" on the first and second readings, and on the third reading, amendments would be introduced "that would really introduce the gist of what we wanted." Peter V. Pappas further explained, according to Wille, that the undisclosed amount of money would be required only if the bill passed both Houses, was signed by the Governor, and was indexed.[9]

Chalden's testimony as to the November 5, 1971 luncheon meeting revealed that Peter V. Pappas suggested to those present that an effective way of introducing the bill was through the Illinois Motor Vehicle Laws Commission (MVLC or Commission). He further stated that it would be possible, if the bill were properly presented, to have the bill come out as a Commission sponsored bill. Since a Commission meeting was close at hand, Peter V. Pappas advised those present that they would have to develop something quickly and that he would help them develop testimony. Peter V. Pappas reiterated the sentiments Lauwereins expressed earlier in Bloomington that it would be best to have a downstate spokesman introduce the bill in the Commission.

Meanwhile, back in Springfield, a few days after Pete Pappas, Craig and Carpentier discussed the amount of money required to get the bill through, Pete Pappas spoke with Peter V. Pappas in the Capitol Building. Pete Pappas informed Peter V. Pappas that he had talked with Craig, Carpentier and Course and that "they would need $20,000.00 for the House and $20,-000.00 for the Senate" and that Peter V. Pappas was to put "whatever he needed for himself on top of that and that the money would have to be paid as the legislation passed each House." Peter V. Pappas then said, "O.K., I will get back to you."

The Commission held a meeting at a hotel in Springfield on the evening of November 8, 1971. Herbert Craig of the downstate industry association (ID–MRCA) was to make a presentation of the industry's proposal on ready-mix weight relief. On the afternoon preceding the meeting, Peter V. Pappas met with Wille, Lauwereins, Chalden, McBride, Marcy and Herbert Craig to prepare and rehearse Herbert Craig's presentation. Following Herbert's presentation to the Commission, the Commission directed Herbert to return to the Commission's De-

---

**8.** Initially, the industry sought weight relief legislation pertaining to dump trucks as well as ready-mix cement trucks.

**9.** Indexing, in this context, means the assignment of a law to a specific area of reference in a scheme of statutory compilation. For a bill to become law, indexing is not a necessary requirement. See: Ill.Const. Art. IV, §§ 8 and 9.

cember meeting with a drafted bill or drafted presentation.[10]

About ten days after the MVLC meeting, the recording secretary of MVLC, Mary Ellen Kingery, mailed copies of a notice of the date, time, and place of the December, 1971, meeting to persons on a mailing list she maintained. Tom Connolly, the executive secretary of NIRMMA, who had earlier requested that NIRMMA be placed on the MVLC mailing list, received a copy of the notice of the December, 1971 MVLC meeting in the mail.

On December 8, 1971, Peter V. Pappas presented a request to the Legislative Reference Bureau, a bill drafting agency for Illinois government, for the drafting of the bill that ultimately became House Bill 4176, the "cement bill."

At the December MVLC meeting, a subcommittee was created to consider the ready-mix legislation. Course, Carpentier, and Pete Pappas were included as members of the subcommittee. Following this meeting, Miss Kingery mailed out notices to those on the mailing list informing them of the date, time, and place of the January 1972 MVLC meeting. The notice also announced that the subcommittee would report on the ready-mix matter.

The MVLC meeting took place on January 10, 1972, in Springfield. On the afternoon of that day, Peter V. Pappas presented to an executive session of the MVLC the proposals of the ready-mix industry, among which was the proposal that ultimately became House Bill 4176. On that same day, Wille met McBride in a bar at a Springfield hotel. After exchanging pleasantries, McBride told Wille "Well, Mert, I have gotten the word. I know what they want now, fifty big ones." McBride informed Wille

that Peter V. Pappas had given him this figure earlier, that the money would have to be in cash, and that if the bill did not become law, no money would be required. McBride and Wille then went to Lauwereins' room in the same hotel and informed him of the $50,000.00 figure.

Later in the evening of the same day, Wille, McBride, Lauwereins, and Peter V. Pappas met in the same bar in the Springfield hotel. Peter V. Pappas stated that he thought that the garbage legislation had cost as much as the ready-mix legislation, and that they should consider a conduit for the funds. No decision was reached, however, as to who would act as the conduit.

During the period of February 13 to 17, 1972, NIRMMA held its annual convention in Miami Beach, Florida. At this convention a group of several NIRMMA members [11] engaged in a poolside conversation as to the ready-mix bill. After Wille and Connolly informed the group that $50,000.00 in cash was required to secure the bill's passage, a discussion ensued as to how the money could be raised. Several suggestions were made, but the record does not show that any decision on this issue resulted from the discussion.

A couple of weeks after the NIRMMA convention, McBride had a telephone conversation with Tom Connolly. McBride told Connolly that the $50,000.00 fund would have to be available by April 1, "as the people wanted to know that the money was available as the legislation was going through." McBride said that the cash would be placed in a safe deposit box. Signators on the box were to be Connolly and another NIRMMA member, Peter V. Pappas and his wife.

---

10. At this point, the government's statement of facts contains a paragraph, substantially reiterating the testimony of Pete Pappas. In effect Pete Pappas testified that just prior to the November 8, 1971 MVLC meeting, he had a conversation with defendant North relating to the availability of money on weight relief legislation for the ready-mix industry. At that conversation, Pete Pappas told North, "I had something going on the cement bill and it was going

to be in the Commission meeting." North responded, "Fine." Although of no relevance to the events immediately preceding and following in the statement of facts, this evidence of North's initial exposure to the scheme is treated *infra*.

11. Merlin Wille, Tom Connolly, Bernard Arquilla, Rich Wille, Jerry Nagel, and Lou Lincoln.

In mid-February, 1972, after the Florida convention, the NIRMMA Transportation Committee held a meeting. Lauwereins, who chaired the meeting, explained the cement bill and its benefits to the ready-mix industry. Lauwereins stated that the bill would cost $50,000.00 in cash, and that it had been decided that the sum would be raised by assessing NIRMMA members $40.00 for each ready-mix truck they owned. NIRMMA Transportation Committee members were then assigned specific collection duties.

About this time, on February 29, 1972, Lauwereins travelled from Chicago to Indianapolis, Indiana and addressed a group of downstate Illinois ready-mix executives including Chalden and Herbert Craig. This address took place in a hotel room in Indianapolis. The downstate ready-mix industry association (ID–MRCA) was holding its annual convention in Indianapolis. Lauwereins told the group that the favorable ready-mix bill would cost $50,000.00 in cash, which had to be collected quickly and placed in a safe deposit box. After indicating to the group that the money would not be paid out unless the bill became law, Lauwereins encouraged ID–MRCA to support the effort by collecting half of the $50,000.00 amount. Lauwereins then returned to Chicago. In spite of Lauwereins encouragement and request for support, ID–MRCA refused to participate in the cash collection effort.

During the month of March, 1972, NIRMMA Transportation Committee members pursued the collection duties previously assigned by Lauwereins.[12] By the end of the month, Connolly told Wille to meet him at the NIRMMA office with the collected cash. Wille told Connolly that the fund was $3160.00 short because some companies had refused to contribute. Wille agreed to make up the $3160.00 shortage in the form of an advance from Moeller through Meyer Material.

On the morning of March 30, 1972, Wille, Lauwereins, McBride and Connolly met at the NIRMMA office. A total of $50,000.00 in cash was counted by Connolly and placed in an envelope. Wille informed Connolly that Moeller of Meyer Material had contributed the $3160.00 to make up for the shortage and suggested that false expense vouchers should be prepared and presented to Connolly to reimburse Meyer Material for the extra money. Connolly agreed, and false vouchers were prepared and submitted to NIRMMA by Wille, Moeller, Lauwereins, and Arquilla. Lauwereins and Arquilla mailed their expense vouchers to the NIRMMA office. Connolly then prepared NIRMMA checks which, when cashed, were used to reimburse Meyer Material for its $3160.00 advance.

Having assembled the fund, Connolly and McBride left the NIRMMA offices and drove to the First National Bank of Lake Bluff where they met Peter V. Pappas in the parking lot. Peter V. Pappas asked Connolly if he had the money, to which Connolly answered affirmatively. Thereupon, Connolly, with the money in his hand, and Peter V. Pappas entered the bank. McBride remained in the car. After entering the bank, Peter V. Pappas mentioned to Connolly that he had arranged for a safe deposit box. Connolly signed a signature card, and took a second signature card for Arquilla's signature. Connolly received a key to the safe deposit box, and then he and Peter V. Pappas took the box which the clerk had handed to them into a small room where both counted the money and placed it in the box. They returned the box to the clerk, who placed it in the vault. Both departed from the bank.

12. The record reflects the following collections: Arquilla collected funds from Accurate Ready-Mix, Brandt Ready-Mix, Oremous Company, and Valenti Ready-Mix, and gave the collected funds to Connolly; Edmier collected cash from Edmier, Inc., Jousma Ready-Mix, Davidson Ready-Mix, and Van's Fuel and Material, and gave the cash to Wille; Wigginton collected from Evanston Fuel and Material, Dealer's Ready-Mix, Edison Fuel and Material, and Thelen Ready-Mix and had the cash delivered to Wille; Lauwereins collected cash from Lester Crown of Material Service Corporation; Wille collected cash from Meyer Material, Cowhey Company, Kuhn Ready-Mix, and also received cash from Moeller which was collected from several other ready-mix companies.

House Bill 4176, the "Cement Bill," was introduced in the Illinois House of Representatives on April 11, 1972. Two or three days prior to that date, Peter V. Pappas told Pete Pappas in the rotunda area of the Capitol Building that the cash had been collected and was in a safe deposit box in the Chicago area. Peter V. Pappas assured Pete Pappas that, although the money was located in Chicago, there would be no problem in delivering the money. Peter V. Pappas also told Carpentier that the money had been put in a safe deposit box.

House Bill 4176 was assigned to the House Motor Vehicle Committee. A notice was posted on April 20, 1972 for hearings by that committee. Prior to the posting, Peter V. Pappas told Pete Pappas that the cash was in a safe deposit box and everything was set to go. Peter V. Pappas also said that the industry would pay the money as soon as the governor signed the bill. Pete Pappas then stated, "Wait a minute, Pete. That wasn't our deal. Our deal was that the money was to be paid as it passed each House." Peter V. Pappas replied, "Well, this is what the industry wants." Pete Pappas then responded, "Well, I'm going to have to talk to Bob on that."

Immediately thereafter Pete Pappas spoke with Robert Craig and told Craig that Peter V. Pappas had said that the industry was not going to pay any money until the bill had been signed by the governor. Craig responded "That wasn't our deal. Our deal was it was supposed to be paid as it passed each House." Pete Pappas replied, "Well, then we better go over and talk to Pete [Peter V. Pappas], about it."

Within a few minutes, Craig and Pete Pappas spoke with Peter V. Pappas. Craig said "Peter, our deal was that we were to get paid when the bill passed each House." Peter V. Pappas replied, "The industry is not going to pay until this bill is signed by the governor." After further discussion, Robert Craig asked Pete Pappas if it were all right if they compromised and said, "We would let it go until it passed both Houses and then get the money." Craig then told Peter V. Pappas that, "We would compro-

mise and the industry would have to pay us the money after it passed both the House and the Senate but it had nothing to do with the governor's signature." Peter V. Pappas responded, "Okay, I will talk to them." A few days later, Peter V. Pappas informed Pete Pappas that "the industry would pay, would go ahead with our agreement and pay when the bill passed both houses of the General Assembly."

House Bill 4176 was passed by the Illinois House of Representatives on May 12, 1972. The bill was introduced in the Illinois Senate on May 15, 1972.

About a week or two weeks before House Bill 4176 was introduced in the Illinois Senate, Carpentier spoke with ten Republican senators, among whom was Jack E. Walker, a Republican member of the Illinois Senate from Lansing, Illinois. In the conversation with Walker, Carpentier asked Walker to support the cement bill and Walker said he would. Carpentier also told Walker "that there would be help in his district."

After speaking with Walker and the nine other Republican senators, Carpentier told Peter V. Pappas that Carpentier "could muster 11 votes on the Republican side." Peter V. Pappas replied that he would see what he could do on the other side of the aisle. One or two days after that, Carpentier told Course that Carpentier had 11 votes and that Course "would have to muster up the rest."

While House Bill 4176 was pending in the Senate committee (around June 1, 1972), Herbert Craig received a phone call from Lauwereins who told Herbert Craig that the bill was in jeopardy and that Peter V. Pappas needed $500 in cash. Lauwereins told Herbert Craig to draw the $500 from his out-of-pocket expenses and Lauwereins would render a statement from NIRMMA covering the $500. Lauwereins told Herbert Craig to take the $500 to the third floor of the Capitol Building where Peter V. Pappas would meet him. Herbert Craig related Lauwereins' request to Chalden.

The next day, June 2, 1972, Herbert Craig and Chalden prepared a $500 check and cashed it. Herbert Craig took the cash

to the third floor of the rotunda area and was met by Peter V. Pappas. Peter V. Pappas asked Herbert Craig if he had the envelope with the money and when Herbert Craig replied, "Yes," Peter V. Pappas said "Follow me." They went into an office and Peter V. Pappas opened a magazine, laid it on a desk and told Herbert Craig to put the envelope with the money inside the magazine. Craig did as instructed and Peter V. Pappas said "That's all. You may be excused." Herbert Craig then left and related the incident to Chalden.

The Senate sponsor of House Bill 4176 was originally Senator Harris. About mid-June 1972, while House Bill 4176 was pending in the Senate, Carpentier told Walker that Senator Harris could no longer sponsor the bill because Harris was sick. Carpentier told Walker that if Walker would handle the bill, "that an additional $500 would be given him." Walker agreed to handle the bill.

Thirty senators voted in favor of House Bill 4176 in the Illinois Senate, which was the exact number of votes required for passage. House Bill 4176 was passed by the Illinois Senate on June 21, 1972.

Chalden, the executive secretary of the ID–MRCA was sitting in the Senate gallery when House Bill 4176 passed the Senate. The following day, June 22, 1972, Chalden prepared a bulletin announcing the fact that House Bill 4176 had passed the Senate and was heading to the governor. Chalden mailed a copy of that bulletin to every member of the ID–MRCA, including Material Service Corporation, to inform them of the bill's passage and to urge them to contact the governor and urge the governor to sign the bill into law.

Connolly mailed a similar bulletin to every regular member of NIRMMA on June 23, 1972 to urge the members of NIRMMA to write, wire or call the governor and ask the governor for favorable approval of the bill. Wille, upon receipt of a copy of the bulletin, sent a telegram to the governor, and received a response from the governor's office. Carpentier also urged the governor to sign the bill.

The spring session of the Illinois General Assembly ended on July 1, 1972. After the end of the legislative session, Pete Pappas telephoned Peter V. Pappas in early July 1972 and said, "Peter, this is Pete. I am just calling to see when we are going to get our money." Peter V. Pappas replied that he was trying to get it together and they were a little slow, but he would see what he could do." Peter V. Pappas recommended that Pete Pappas call McBride and gave McBride's phone number to Pete Pappas.

In the early to middle part of July 1972, Pete Pappas telephoned McBride and told McBride, "Jim, this is Representative Pete Pappas and I am calling about the money." McBride said, "Well, they are working on it." Pete Pappas replied "Well, we have some commitments to meet." McBride responsed, "Well, let me check into it and I will get back to you."

In early August 1972, Peter V. Pappas informed Pete Pappas that the industry was not going to pay because there was a rumor that the governor was going to veto the bill. Pete Pappas responded, "I don't care about that, we have commitments to meet and we at least want to pay our commitments." Peter V. Pappas replied "Well, why don't you call Morry Lauwereins and talk to him about it," and gave Pete Pappas Lauwereins' phone number.

That same day or the next day, Pete Pappas telephoned Lauwereins and said "Mr. Lauwereins, this is Representative Pete Pappas and I am calling about the money." Lauwereins said "I understand that the governor is going to veto the bill." Pete Pappas responded, "Well, I don't care what the governor does because that wasn't part of our arrangement. Our arrangement was to get it through both Houses and you agreed to pay. Now we have commitments to meet and we would like to have the money." Lauwereins said he would check into it and let Pete Pappas know.

On August 8, 1972, House Bill 4176, the cement bill, was vetoed by Governor Ogilvie. On that day the $50,000 was still in the safe deposit box.

On August 14, 1972, during a tugboat ride in conjunction with an MVLC meeting, Course told Carpentier that some of Course's fellows were "getting restless," and Carpentier replied, "I will talk it over with Representative Pappas, because he is handling it."

Also, in August 1972 after the veto, McBride told Wille that Senator Course had called McBride and had asked McBride for his campaign contribution. McBride told Wille that McBride had told Course that McBride did not know anything about it. Lauwereins also called Wille about the same time. Lauwereins said that he had received some information that "some of the legislators felt they had done their job and that even though the bill had been vetoed and it had not become law, that they should be entitled to some money." Wille asked Lauwereins, "What about our earlier 'no bill, no pay' provision?" Lauwereins replied that that was the earlier agreement.

At a luncheon meeting among Wille, McBride, and Lauwereins at a restaurant in Hillside, Illinois, in the latter part of August 1972, McBride told Lauwereins of the phone conversation McBride had had with Course. McBride went on to say that he had had a recent conversation with Peter V. Pappas and that the legislators felt that they had done their job and although the earlier agreement was $50,000 they were willing to settle for $30,000. McBride stated that before it was decided not to pay anything the industry should consider the consequences of a veto override or an additional seasonal or permit bill. McBride also said that Peter V. Pappas had said he could draw up an additional bill, a seasonal or permit bill, for an additional fee of $5,000. Wille stated that they could not spend any of the money that had been collected because of their representations to the other ready-mix dealers that it was "no bill, no pay." Lauwereins concurred.

Wille, the following morning, informed Moeller of McBride's comments. Moeller agreed that the $30,000 should not be taken from the $50,000 fund, but that the $30,000 should come from the two companies that had the most trucks in the industry, Meyer Material Company and Material Service Corporation.

At a motel in Des Plaines, Illinois, McBride, Lauwereins, Moeller, Wille and Gerald Nagel of Material Service Corporation met in early September 1972. Lauwereins told Nagel and Moeller that the legislators felt they were entitled to $30,000 instead of the original $50,000 and that Peter V. Pappas could draw up a seasonal or permit bill for an additional $5,000. Nagel and Moeller both asked what happened to the original no bill, no-pay agreement. McBride could not answer that question, but said that Nagel and Moeller should consider what the consequences might be if they chose not to do anything. McBride also said that it was possible that there could be a veto override and that Moeller and Nagel should consider what should be done. Lauwereins and Wille said that they, themselves, could not make the decision. Moeller said "the $30,000 should be put up and it should be contributed by Meyer Material and Material Service Corporation." Nagel concurred.

On the evening of September 11, 1972, following the MVLC meeting Peter V. Pappas told Craig, Carpentier and Pete Pappas that the industry was not going to pay anything for the passage of the bill because the Governor had vetoed it. Pete Pappas then said, "That was not our deal. We had a commitment; they were going to pay us if it passed both Houses. We had no control over what the Governor did." Pete Pappas went on to say, "We have commitments that we have to meet; they should at least pay us enough so we could meet our commitments." There was a general discussion about the amount of money necessary to fulfill commitments. Craig said that he thought that he could take care of his commitments for "five." Pete Pappas and Carpentier agreed that if Craig could take care of his commitments for $5,000, they could take care of their commitments for the same amount. Peter V. Pappas said that he would talk to the industry and get back to them.

In September 1972, Lauwereins telephoned Wille and asked Wille to take Meyer Material Company's half of the $30,000 to McBride's house in Westchester. Wille told Moeller about Lauwereins' phone call requesting Wille to take the money to McBride's house, and asked Moeller to have the money ready when Wille needed it. Moeller said he would.

Around the end of September, Wille received $15,000 in $100 bill denominations in an envelope from Moeller. That same day Wille went to McBride's house in Westchester. Lauwereins and Wille arrived at McBride's house at about the same time. They proceeded to the basement of the house where they met McBride and Peter V. Pappas. Wille and Lauwereins both placed envelopes containing cash on a table. Peter V. Pappas removed the contents of both envelopes and counted the money. The envelope Wille had brought contained $15,000. The envelope Lauwereins had placed on the table contained $14,100, $900 short of the $15,000 amount. McBride told Peter V. Pappas that McBride would get the missing $900 to Peter V. Pappas at a later date. Peter V. Pappas then put the money back in the envelopes and put the envelopes in his brief case. Peter V. Pappas said that he had to make a stop on the way down to Springfield. Peter V. Pappas also stated, "Five years ago when a man told you you had his vote, you could count on it; today you have to wait to see if he punches the button and the light lights up to know for sure."

Peter V. Pappas in September 1972, delivered $5,000 in cash in an envelope to Course which Course then delivered to various Democratic state senators.

On September 25, 1972, Peter V. Pappas met Pete Pappas, Carpentier and North at the Coffeehouse on Interstate 80 near Marseilles, Illinois and delivered $10,000 in cash in an envelope to Pete Pappas.

About a week before that meeting, Peter V. Pappas told Pete Pappas by phone that he (Peter V. Pappas) had the money and wanted to set up a meeting with Pete Pappas to deliver it. Peter V. Pappas mentioned a date that he was going to Springfield. Pete Pappas replied "Well, that date is all right with me. Why don't we meet at the Coffeehouse, which is on Interstate 80 and it would be on your left side as you are driving down Interstate 80." The meeting was set for 10:00 o'clock in the morning.

Immediately after the phone conversation with Peter V. Pappas, Pete Pappas telephoned Carpentier and said, "Donnie, I just had a call from Peter V. and he has the money and he wants to meet us at the Coffeehouse on Interstate 80 at 10:00 o'clock in the morning" on the date agreed upon. Pete Pappas asked Carpentier if Carpentier could make it. Carpentier said he could, and would ride up with Pete Pappas.

Pete Pappas told North by phone of the phone call from Peter V. Pappas. Pete Pappas told North that if North could make the meeting at the Coffeehouse, Pete Pappas would have something for him. North said that he thought he could. Pete Pappas said "Okay, fine."

Pete Pappas met Carpentier the morning of September 25, 1972 at the Moline Airport and drove to the Coffeehouse on Interstate 80 near Marseilles, Illinois. When Pete Pappas and Carpentier arrived at the Coffeehouse that morning North was already there. North, Carpentier and Pete Pappas had a cup of coffee while they were waiting for Peter V. Pappas to arrive. After waiting approximately twenty-five monutes, Carpentier placed a phone call to Peter V. Pappas' home in Lake Bluff and was told that Peter V. Pappas had left for Springfield. Another twenty minutes passed before Peter V. Pappas arrived and entered the Coffeehouse.

When Peter V. Pappas arrived at the Coffeehouse, he had a cup of coffee and asked Carpentier to call Peter V. Pappas' office in Springfield. Carpentier obliged. While Carpentier was on the phone North, Pete Pappas and Peter V. Pappas left the Coffeehouse.

Pete Pappas and Peter V. Pappas, upon leaving the restaurant, got into Peter V.

Pappas' car. Peter V. Pappas sat behind the wheel and Pete Pappas sat on the passenger side. North walked out into the parking lot away from the car. In the car, Peter V. Pappas placed an envelope on the front seat of the car and said "Now, if anybody asked you if I gave you any money you say I didn't." Pete Pappas picked up the envelope containing the money from the seat and put it in his coat pocket. Peter V. Pappas said that he had already given Course his "five" and that he was going to see Craig later in Springfield.

Pete Pappas got out of Peter V. Pappas' car with the envelope, went over to his own car and got in. Pete Pappas then opened the envelope and counted out ten $100 bills. Pete Pappas got out of his car, walked over to North and gave North the ten $100 bills. North and Pete Pappas discussed having lunch at the LaSalle Holiday Inn and North got in his car and left.

When Carpentier joined Pete Pappas, Pete Pappas requested Carpentier to drive the car, which Carpentier did. During the ride from the Coffeehouse to the LaSalle Holiday Inn on Interstate 80, Pete Pappas counted out $5,000 in $100 bills and handed it to Carpentier. Carpentier put the money into his inside coat pocket. North, Carpentier and Pete Pappas had lunch together at the LaSalle Holiday Inn.

Carpentier and Pete Pappas arrived back in Rock Island about 3:30 p. m. that day. Carpentier then went to his insurance office in Moline and put the $5,000 he had received from Pete Pappas in a file box which he then put in a file drawer in the office.

A few days later, Carpentier had his wife type nine envelopes addressed to nine Republican senators, including an envelope addressed to Walker. The addresses were obtained from the legislative handbook. In the envelope addressed to Walker, Carpentier put five $100 bills wrapped in a piece of paper. Carpentier placed a $100 bill in each of the other eight envelopes. Carpentier then took the nine envelopes which had proper postage and deposited them in the mail box by the side of the front door of his office.

On the morning of November 4, 1972, Pete Pappas, Course and Peter V. Pappas met with ready-mix industry members Wille, McBride, Lauwereins, and Herbert Craig for breakfast at a restaurant in Springfield. At that meeting there was a discussion whether a veto override of House Bill 4176 should be attempted. Course stated near the end of the meeting that an override was impossible since there were not enough votes, and Pete Pappas stated that he felt it would be better if an override of the Governor's veto was not attempted, but that a new bill could be pursued in the next session.

In the latter part of December 1972, Connolly and Peter V. Pappas returned to the bank in Lake Bluff and retrieved the $50,-000 from the safe deposit box. Connolly took the money and returned portions of it to Wille, Lauwereins and Arquilla. Connolly kept the $3,160 which Meyer Material advanced to the $50,000 fund. Connolly placed the cash in the NIRMMA office safe, where it remained until trial.

After the commencement of the grand jury investigation which led to the indictment in this case, Carpentier was served with a subpoena to appear before the grand jury on May 30, 1973. On May 29, 1973, Carpentier informed Peter V. Pappas and Course of the receipt of the subpoena and was told by Peter V. Pappas, "Deny everything and if we all stick together, they won't have any case and when you get finished, call me in my office in Springfield." Carpentier appeared before the grand jury on May 30, 1973, and after his grand jury appearance called Peter V. Pappas. Carpentier told Peter V. Pappas that he (Carpentier) had denied everything before the grand jury and Peter V. Pappas said, "Great, if we all stick together like that, we will have no problem."

In August of 1973, Craig telephoned Pete Pappas and arranged a meeting with Pete Pappas at the Streid's Restaurant in Bloomington, Illinois. In attendance at the meeting were Craig, Peter V. Pappas, Pete Pappas and Lou Markert, a former legislator. Markert left the meeting at Peter V. Pap-

pas' request. After Markert left, Peter V. Pappas told Craig and Pete Pappas that Peter V. Pappas had been visited at his home in Lake Bluff by Assistant U.S. Attorneys Skinner and Stone, who had discussed the cement bill legislation. Peter V. Pappas told Craig and Pete Pappas that he, Peter V. Pappas, could do one of three things in regard to the investigation. Peter V. Pappas said that he could say that he "ratholed" all the money, in other words, that he had got the money but kept it and did not pass any of it on. Peter V. Pappas said that another thing he could do was to tell the government everything he knew about it, and the other thing was not admit anything. Peter V. Pappas said that because he was being called to the grand jury, he would probably need to hire an attorney. He asked Craig and Pete Pappas if they would give him $5,000 apiece to help him pay his legal expenses. Peter V. Pappas also asked Craig and Pete Pappas to contact the other two participants and see if money could be obtained from them also. Peter V. Pappas said that he had been talking to Material Service Corporation but they had dropped him and were not going to help him in any way. Peter V. Pappas said that he heard that some of the executives of Material Service Corporation had received immunity on the case.

Also in the fall of 1973, Peter V. Pappas telephoned Carpentier and said, "that if the fellows would come up with $5,000 apiece, he would amend his tax return showing that he took $20,000 and we would all be off the hook." Neither Pete Pappas nor Carpentier ever gave Peter V. Pappas the $5,000 that Peter V. Pappas had requested.

## II. ISSUES AS TO RECORDED CONVERSATIONS

All four appellants raised issues with respect to the conversations recorded by Carpentier and Pete Pappas. Prior to trial, defendants Craig, Walker, and Peter V. Pappas moved the district court to suppress those tape recorded conversations. Following a hearing, the district court denied their motion.

It appears from the record that defendant Carpentier had been called to testify before the grand jury investigating this case on two occasions, once in May and once in June (or July), 1973. In December of 1973 Carpentier engaged an attorney who conducted negotiations with the prosecution. By a letter agreement dated March 5, 1974, Carpentier agreed to plead guilty to one felony count of the impending indictment and to cooperate fully in the investigation in this case. The government, in return, agreed to dismiss other counts pertaining to Carpentier and to bring to the sentencing judge's attention Carpentier's cooperation with the government.

Thereafter, around the first of June, 1974, Carpentier permitted postal inspectors to attach a tape recording device to his office telephone. On June 10, defendant Walker telephoned Carpentier at his office. The conversation was recorded. Carpentier then immediately called Assistant United States Attorney Skinner to inform him of the call. Skinner told Carpentier to place a call to Walker, admonishing Carpentier not to disclose the fact that he was a government informant and to try to talk about money he had given Walker and to let Walker talk. Carpentier complied, and a second conversation between Carpentier and Walker was recorded. A third conversation was recorded on July 11, 1974. The record reveals that prior to any recordings, the government was aware that Walker had retained counsel.

Walker contends that the tapes of conversations recorded by Carpentier between himself and Carpentier should have been suppressed, and that the admission of the tapes into evidence at trial constituted error. In this regard, Walker argues that the government activity which resulted in the recording of his telephone conversations constituted an unreasonable search and seizure under the Fourth Amendment, a denial of due process under the Fifth Amendment, a denial of the right to counsel under the Sixth Amendment, and a violation of 18 U.S.C. § 2511.

We note at the outset the well-settled principle that there is no interest protectible by the Fourth Amendment in those situations in which one party to a conversation reposes a trust or confidence in the other party who is actually an undisclosed government agent or informant. *E. g., Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Simply put, no legitimate Fourth Amendment interest is involved in such situations, for that Amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* at 302, 87 S.Ct. at 413. Nor is the Fourth Amendment violated because the undisclosed agent simultaneously records the conversation with an electronic recording device on his person, *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963), or because the conversation is electronically transmitted by the undisclosed agent to a remote place where it is overheard by other agents and/or recorded. *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). Evidence in the form of tape recordings of such conversations are generally admissible where one party to the conversation consents to the electronic recording. *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *United States v. Bastone,* 526 F.2d 971 (7th Cir. 1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976); *United States v. Martin,* 372 F.2d 63 (7th Cir. 1967); *cert. denied,* 387 U.S. 919, 87 S.Ct. 2033, 18 L.Ed.2d 972 (1967). There is no doubt from the record that Carpentier voluntarily consented to the recording of his conversations with Walker.[13]

Further, Walker's contention that his Fifth Amendment rights were violated since he should have been made aware of his rights prior to making any statement is of no avail. Advice of rights is required in custodial situations where the inherent pressures to speak in the face of governmental authority are present. *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1; *United States v. Gardner,* 516 F.2d 334 (7th Cir. 1975), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975). As Judge Bauer stated in *United States v. Bastone, supra,* 526 F.2d at 977:

> "A person is not entitled to warnings simply because an investigation has focused upon him. The test is not focus alone, but rather, focus plus custodial interrogation. *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)."

While it is clear the investigation had focused upon defendant Walker, his recorded conversations with Carpentier involved no confrontation with governmental authority in the context of a custodial interrogation calling for *Miranda* warnings. Consequently, we must reject Walker's contention that the recordings violated his Fifth Amendment rights.

Nor did the recordings violate Walker's Sixth Amendment right to counsel. By its own terms, the Sixth Amendment affords the right of counsel "[i]n all criminal prosecutions." For purely Sixth

---

13. Conceding that the record fully supports the district court's finding that Carpentier had given prior consent to the recordings, Walker nevertheless contends that the consent of Carpentier was under the peculiar circumstances of this case the consent of the government itself, and, hence, without legal effect. Arguing that there were no exigent circumstances to justify the government's failure to obtain a court order for the interception of the communications pursuant to 18 U.S.C. § 2518, Walker asserts that Carpentier's consent without judicial approval should be held for naught. We do not agree. Congress has seen fit to condone the interception of communications where the person intercepting is acting under color of law and has given his prior consent thereto. 18 U.S.C. § 2511(2)(c). We find, and Walker concedes, that the record amply supports the district court's determination that the conversations and the circumstances under which those conversations were recorded fall within 18 U.S.C. § 2511(2)(c). Even if a finding of valid consent could be held for naught in view of the peculiar circumstances of a given case, we find no such peculiar circumstances in the record before us.

Amendment purposes, a defendant's right to counsel attaches only at or after the time the adversary judicial proceeding has been initiated against him. *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1971) (plurality opinion of Stewart, J.); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). See also: *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). One accused of a crime is said to be entitled to counsel at any "critical" stage of the prosecution. *United States v. Wade*, 388 U.S. 218, 236, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California*, 388 U.S. 263, 267, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Walker's right to counsel argument must fail for the simple reason that there had not yet been a "criminal prosecution" when his conversations with Carpentier were recorded.[14]

Nevertheless, Walker argues that at the time of the recorded conversations the government was no longer simply investigating him. Walker asserts that because Carpentier would testify that he had bribed Walker and because other witnesses would provide evidence needed to establish other elements of the scheme, his indictment "was then as certain as the sun setting in the West and that it was being deferred merely to permit the government to beef up its case with admissions to be obtained by stealth and trickery." Walker concludes by stating that "the indictment was being withheld, perhaps with the conscious purpose of avoiding any right to counsel problems."

■ The record does not support Walker's contentions. Nothing therein indicates that the government withheld the indictment for any purpose whatsoever. Furthermore, in an investigation into a complex scheme involving as many persons, oc-

curring in as many places, and carried on as long as the scheme established by the government in this case, we are compelled to reject Walker's unadorned contention that his formal charge was withheld for the purposes asserted here. In any event, the government is certainly not required to cease an on-going investigation into a far-reaching scheme such as this when it appears to have probable cause to seek an indictment as to one individual. *Cf. Hoffa v. United States, supra; United States v. Gardner, supra; United States v. Skelley*, 501 F.2d 447 (7th Cir. 1974), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 629, 42 L.Ed.2d 647 (1974).

Recognizing that his individual claimed violations of Fourth, Fifth and Sixth Amendment rights alone are insufficient to warrant reversal, Walker submits that the totality of the circumstances in this case requires us to hold that the government activity exceeded permissible bounds. We reject Walker's totality of the circumstances argument because, for the reasons stated with respect to the individual claimed violation of rights, we find no support in the record for the assertion that the activity of the government exceeded permissible bounds. However damning the effect of the tape recordings upon Walker's case, we find nothing in the record to indicate that his rights were violated by the recordings of conversations with Carpentier, or the admission into evidence of those recordings.

■ Defendant Peter V. Pappas also contends that tapes of conversations between himself and Pete Pappas on September 27, 1973 and October 15, 1973 should have been suppressed. The tape recordings of those conversations were inadmissible, Peter V. Pappas argues, because Pete Pappas was neither acting under color of law nor had given prior consent to the intercep-

---

**14.** Nor does it make a difference that the government knew prior to the recordings that Walker was represented by counsel. The violation of the Sixth Amendment right to counsel as claimed here is to be viewed in the context of whether the claimed violation occurred in a critical stage of a *prosecution*, and not in the

context of whether defendant had retained counsel in face of a government investigation. Compare *United States v. Lemonakis*, 158 U.S. App.D.C. 162, 175, 485 F.2d 941, 954 (1973), *cert. denied*, 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1973).

tion of their conversations within the meaning of 18 U.S.C. § 2511(2)(c).[15]

The record shows that on October 17, 1973, Pete Pappas and the government entered into a letter agreement by which Pete Pappas agreed to enter a plea of guilty to a violation of 26 U.S.C. § 7206(1) [making a false statement in an income tax return], to cooperate fully with the government in its investigation, to not run for re-election as a State Representative, and to resign from office prior to testifying at trial. In return, the government agreed not to prosecute Pete Pappas any further, not to use any information he supplied against him in any way, and to recommend probation at the time of sentencing.[16]

Peter V. Pappas argues that Pete Pappas' recordings of two conversations prior to entering into the plea agreement were accomplished for purely selfish purposes designed to increase his (Pete Pappas') value to the government as a witness. In support of this argument, Peter V. Pappas points outs that Pete Pappas, through his attorney, offered to tape the conversations, and that the government could not use the tapes unless and until it had reached an agreement with Pete Pappas. As such Peter V. Pappas concludes, Pete Pappas was not acting "under color of law." We do not agree. Our review of the record indicates that Pete Pappas agreed to cooperate with the government prior to recording any conversations with Peter V. Pappas. Pete Pappas' attorney suggested the recordings during the course of plea negotiations because Peter V. Pappas had been demanding money from Pete Pappas for use as attorney's fees, and the attorney was concerned that by giving Peter V. Pappas money, Pete Pappas might become involved in "an obstruction of justice situation" if it later turned out that the money was not for attorney's fees but rather for use as an encouragement not to testify. The prosecutor, then Assistant United States Attorney Skinner, agreed that if plea negotiations with Pete Pappas fell through, there would be no use of the recorded material against Pete Pappas.

Every aspect of the recording of the conversations on September 27 and October 15 was supervised by the government. Pete Pappas only taped those conversations which the government directed him to record. The government supplied the recording equipment and an agent who operated the equipment. The agent remained nearby until Pete Pappas had finished recording. After each recording, the agent took custody of the equipment and the original tapes. Under our view of the record, whatever may have been Pete Pappas' motive in cooperating with the government, he was "acting under color of law" within the meaning of 18 U.S.C. § 2511(2)(c).

Peter V. Pappas also contends that Pete Pappas had not given his prior consent to the recording of the conversations to which he was a party. In this regard, Peter V. Pappas argues that prior to the written agreement of October 17, 1973, the government was precluded from using the tapes of any of Pete Pappas' recorded conversations against him because, prior to that date, the government did not have Pete Pappas' consent. In substance, Peter V. Pappas argues that Pete Pappas withheld his consent to the interception of the conversations to which he was a party until the date of the written agreement.

**15.** 18 U.S.C. § 2511(2)(c) provides as follows: "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such a person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

**16.** The agreement recited that Pete Pappas would provide information concerning various legislators and their relationship with members of the organized crime syndicate in Chicago,

and that his incarceration after a guilty plea and cooperation represent a serious threat to him and his family. On the same day he signed the agreement, October 17, 1973, Pete Pappas, his attorney, and the prosecutor appeared before Judge Morgan of the United States District Court for the Southern District of Illinois, at which time the plea agreement was disclosed to the Judge. Pete Pappas entered a plea of guilty as agreed on January 20, 1975. He was sentenced to a one year probationary term.

We reject this argument because it is not supported by the record, and, further, because it assumes that there can be no valid prior consent under these circumstances until there is a formal plea agreement. We find no support, and Peter V. Pappas had demonstrated none, for such an assumption. It is clear from the record that Pete Pappas gave his prior consent to the interception and recording of the conversations.[17]

Defendant Craig also contends [18] that the district court erred in denying the pre-trial motion to suppress evidence in the form of tape recordings of conversations made by Pete Pappas in which Craig was a participant.[19] Craig argues that Pete Pappas was instructed by the government to elicit confessions of culpability in past events by indulgence in cajolery, mutual sympathy, and false pretenses. Further, Craig points out that as far as the September 27, 1973 conversation was concerned, Pete Pappas' mission was to tape only a conversation with Peter V. Pappas. Under such circumstances, Craig argues, Pete Pappas was obliged to advise Craig of his true function as a government agent, and that the government cannot rely on 18 U.S.C. § 2511(2)(c).

We find no merit to Craig's attempted distinction between culpable statements contained in recorded conversations occurring during the commission of an offense, and such statements occurring after the commission of an offense. The indict-ment charged, and the evidence showed, a conspiracy among the defendants and various unindicted co-schemers (among whom was Pete Pappas) occurring over an extended period of time. The recordings of which Craig complains were made during the existence of the alleged and proven conspiracy. Furthermore, Craig voluntarily participated in the conversations, albeit without knowledge of Pete Pappas' true function as an individual cooperating with the government in its investigation.[20] At the time of the recorded conversations, Pete Pappas' trustworthiness and confidentiality were characteristics which Craig necessarily risked, and Craig cannot be heard to complain when it is afterwards learned that Pete Pappas actually had been a government informant and evidence of damaging conversations are later introduced at trial. *See, e. g., Hoffa v. United States, supra; United States v. White, supra; United States v. Lemonakis, supra.*

Craig further contends that the tapes of his conversations should not have been admitted into evidence "for want of preserving their integrity." In substance, Craig argues that no chain of custody of the tape recordings was proven at trial. Specifically, Craig complains of the admission into evidence of tapes of conversations occurring between himself and Pete Pappas on September 27, 1973 [21] and October 23, 1973.

The record shows that government exhibit 101–0 and 103–0 purported to be the original tape recordings of the September

---

17. The facts in this case are demonstrably distinguishable from the facts in *Weiss v. United States*, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed.2d 298 (1939), relied upon by Peter V. Pappas. *Weiss* involved the interceptions of communications of which the participants were ignorant and to which they did not consent. 308 U.S. at 330, 60 S.Ct. 269. In this case, the record indicates that Pete Pappas knew and consented to the interceptions.

18. Craig adopts partially the arguments of defendant Walker with respect to the issue of the admissibility of tape recordings of conversations between a defendant and an undisclosed government agent. To the extent that Craig adopts Walker's arguments, we reject those arguments for the reasons expressed in connection with defendant Walker's contentions.

19. Craig, Peter V. Pappas, and Pete Pappas participated in a conversation on September 27, 1973, at a hotel in Chicago. Pete Pappas recorded that conversation. Craig and Pete Pappas also participated in a conversation which Pete Pappas recorded on October 23, 1973, at a motel in Springfield.

20. We also reject Craig's claim that under the circumstances of this case Pete Pappas was obliged to reveal his status as an informant. Our reasons for doing so are expressed in connection with an identical claim made by defendant Walker, *supra*, with respect to *Miranda* warnings.

21. Peter V. Pappas was also a party to this conversation and was taped.

27, 1973 and October 23, 1973 conversations respectively.[22] Pete Pappas testified that immediately prior to his September 27 meeting with Craig and Peter V. Pappas at a hotel in Chicago, he went to the room of Postal Inspector D'Hooge in the same hotel, where D'Hooge outfitted him with a tape recorder. After departing D'Hooge's room, Pete Pappas proceeded to an area of the hotel where he conversed with Craig and Peter V. Pappas. The conversation was recorded by Pete Pappas who, immediately after the conversation, returned to D'Hooge's room where the tape recorder was removed from his person. D'Hooge kept the tape.

Pete Pappas further testified that almost two-and-one-half years later, on February 7, 1976, he listened to the tape recording of the September 27, 1973 conversation (government exhibit 101–0), recognized and identified his voice as well as the voices of Craig and Peter V. Pappas, and noted that some parts of the tape were unintelligible. Pete Pappas stated that the tape recordings truly and accurately portrayed the conversations in which he had participated on September 27, 1973. He also testified that a typed transcript of the tape recording was a true and accurate transcript. Pete Pappas testified similarly with respect to the tape recording of the October 23 conversation (government exhibit 103–0) and other conversations he recorded (government exhibits 102–0 and 104–0).[23]

The next witness with respect to the tapes was Professor Weiss, who was qualified and accepted by the district court as an expert. Weiss testified that Postal Inspectors D'Hooge and Kelm visited his New York offices in March, 1976, with the tapes in question, that he subjected the tapes to scientific analysis for purposes of determining the existence of splices or alterations, and that, in his opinion, the tapes contained "no indication of alteration whatsoever." Weiss further testified that he made two

identical copies of the tapes on sophisticated, high quality machines. Weiss improved the audibility of those copies by removing background noises, etc.—"a procedure to make the sound of speech closer to that which you would have obtained using a more ideal recording situation." Weiss kept one copy of each tape for himself, and placed the other copies in sealed bags, signing the seal on each bag. Weiss then handed the sealed recordings to the Postal Inspectors. These copies were subsequently numbered government exhibits 101–1, 102–1, etc. corresponding to the original "–0" series, and Weiss stated from the witness stand that none of these exhibits had been tampered with.

Weiss further testified that later (May, 1976), at the direction of representatives of the government, he deleted certain portions of the "–1" tapes. These tapes were then labelled 101–3, 102–3, etc. Transcripts corresponding to the "–3" series were labelled 101A, 102A, etc. The district court found that a proper foundation had been established for the "–3" tapes with the deletions and enhanced audibility and admitted those tapes into evidence and allowed them to be played for the jury.

No chain of custody of the tapes was proven at trial. Notwithstanding this lack of proof, however, we feel that the tapes were admissible because a proper foundation had been demonstrated. The purpose of the chain of custody rule is to insure that the item offered into evidence is in substantially the same condition as it was at the time the proponent of the evidence came into its possession. *Cf. United States v. Santiago*, 534 F.2d 768 (7th Cir. 1976); *United States v. Brown*, 482 F.2d 1226 (8th Cir. 1973). The purpose of the rule is served where, as here, a proper foundation demonstrating the accuracy and trustworthiness of the evidence is laid. Pete Pappas testified that he participated in the taped conversations, and that the tapes truly and

---

**22.** A copy of these "–0" series recordings were given to defense counsel prior to trial, and the original tapes were made available for inspection.

**23.** Pete Pappas did not testify as to the contents of the conversations he recorded, and his cross examination was postponed until after the tapes were played for the jury.

accurately portrayed the conversations in which he participated. Further, the expert witness Weiss testified that in his opinion the tapes contained no alterations. The district court was satisfied that a proper foundation had been established for the admissibility of the tapes. We agree that there was sufficient evidence that the tape recordings were authentic. On the basis of the record before us we cannot say that that the district court abused its discretion in admitting the tapes into evidence. See *United States v. Biggins*, 551 F.2d 64 (5th Cir. 1977); *United States v. Cosby*, 500 F.2d 405 (9th Cir. 1974); *Monroe v. United States*, 98 U.S.App.D.C. 228, 234 F.2d 49 (1956); *Todisco v. United States*, 298 F.2d 208 (9th Cir. 1961).

This case is thus markedly different from *United States v. Starks*, 515 F.2d 112 (3rd Cir. 1975), on which Craig relies. In the *Starks* case the government relied on a presumption that when evidence of a physical nature has been introduced, the trial court is entitled to assume that public officials did not tamper with exhibits in their possession in the absence of some evidence suggesting otherwise. The court there held that "when a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the tape and the better rule requires that party to prove its chain of custody." *Id.*, 515 F.2d at 122. The court further held that it was error for the trial court to shift to defendant the burden of proving unauthenticity. *Id.* In the instant case, the government did not rely on any presumption of regularity, but rather affirmatively demonstrated the accuracy of the recordings and the absence of any tampering.

Craig also contends that the tapes were inadmissible because their chain of custody was not effectuated pursuant to 18 U.S.C. § 2518(8)(a).[24] Craig argues that although consensual recordings of conversations under color of law pursuant to 18 U.S.C. § 2511(2)(c) may be an exception to court approved interception as established by 18 U.S.C. § 2518, Congress intended the guarantees of integrity found in 18 U.S.C. § 2518(8)(a) to be made applicable to consensual recordings. Craig, however, points to nothing in the legislative history of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 84 Stat. 212, 18 U.S.C. § 2510 *et seq.* to support this contention. Indeed, our research reveals that Congress was primarily concerned with the intrusions into privacy caused by "the widespread use and abuse of electronic surveillance techniques." S.Rep.No.1097, 90th Cong., 2d Sess. reprinted in 2 U.S.Code Cong. & Admin.News pp. 2112, 2154 (1968). Section 802 of the Act, 18 U.S.C. § 2518, was enacted to delineate "on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." *Id.*, at 2153. But consensual interceptions were specifically exempted from those interceptions which would otherwise be unlawful for failure to comply with the Act. 18 U.S.C. § 2511. Congress created this exception largely because it "largely reflects existing law." *Id.*, p. 2182. Since consensual interceptions are significantly different from non-consensual interceptions, and since nothing in the Act or its legislative history indicates that the recordings of con-

---

**24.** § 2518(8)(a) provides:

"The contents of any wire or oral communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire or oral communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be wherever the judge orders. They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years. Duplicate recordings may be made for use or disclosure pursuant to the provisions of subsections (1) and (2) of § 2517 of this chapter for investigations. The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of § 2517."

sensual interceptions were intended by Congress to be subject to 18 U.S.C. § 2518(8)(a), we reject Craig's contention.

■ Craig also contends that reversal of his conviction is required because the court reporter did not transcribe the conversations contained on the tape recordings played for the jury in violation of the Court Reporters Act, 28 U.S.C. § 753(b).[25] Pointing to authorities [26] holding that the requirements of the Act are mandatory, Craig argues that the dispute below was "what was heard in the court." (Reply Br. of Defendant Appellant Craig, p. 21). We find no merit in this contention. The tape recordings played to the jury and the transcript of those recordings are part of the record on appeal to this Court. Thus, we have the most accurate record of what was heard by the jury, and the fact that the court reporter did not transcribe the contents of the tape recordings in no way impedes our review of the proceedings below.[27] Because the tape recordings played to the jury are part of the record on appeal, we find substantial compliance with 28 U.S.C. § 753(b).

Defendant North's contention with respect to the tapes is of a different nature. North argues that the district court erred in not granting him a severance from the other defendants based upon the government's use of recordings and transcripts which contained deletions.[28] North asserts that if he had been tried alone, the tapes would have been inadmissible. North was neither mentioned in the tapes nor was a conversation in which he participated recorded.

■ It is well established that a severance should not be granted except for the most cogent of reasons. *E. g., United States v. Crouch*, 528 F.2d 625 (7th Cir. 1976). Essential to a successful motion for severance is the strong showing of prejudice as a result of its denial. *United States v. Cervantes*, 466 F.2d 736, 739 (7th Cir. 1972). Prejudice, as required for severance, means that the movant will be unable to secure a fair trial unless the severance is granted. A showing that a separate trial will offer a better chance of acquittal is plainly inadequate. *United States v. Blue*, 440 F.2d 300 (7th Cir. 1971).

■ In attempting to make the requisite strong showing of prejudice, North argues, as he did below, that any deletion from the sound recordings would create an unmistakable inference in the minds of the jurors that something very damaging to him had been suppressed. We cannot agree with this argument. We find nothing in the record to indicate that the *Bruton* excisions created any inference in the minds of the jurors. To the contrary, the district court instructed the jury both at the time the tapes were played and immediately prior to its deliberation that the taped conversations were to be considered only against participants in those conversations. Moreover, the court also instructed the jury at the time the tapes were played to disregard the excisions.[29] Having failed to demon-

---

**25.** 28 U.S.C. § 753(b) provides in relevant part:
"One of the reporters appointed for each such court shall attend at each session of the court . . . and shall record verbatim by shorthand or by mechanical means . . . (1) all proceedings in criminal cases had in open court . . . ."

**26.** *E. g. Calhoun v. United States*, 384 F.2d 180, 183–184 (5th Cir. 1967), and cases cited therein.

**27.** Craig argues here as he did below that because he considered the tape recordings unintelligible, he is prejudiced by the failure of the court reporter to transcribe what the reporter heard when the tapes were played, and that the government-prepared transcripts of those tapes are at best its interpretation of the contents of the taped conversations. This argument overlooks our ability to listen to the tapes and determine the accuracy of the government-prepared transcripts.

**28.** The government's expert witness, Professor Weiss, excised certain portions of the tapes at the direction of the government. Such excisions, done with the prior knowledge of all the parties concerned, were effectuated to comply with *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Other than North's contention, no issue is raised as to these deletions.

**29.** Judge Leighton stated in part: "One final point about these recordings: these recordings have been subjected, as you heard Professor

strate that the denial of this severance request resulted in any prejudice, we reject North's contention.

### III. ISSUES AS TO MAIL FRAUD

Defendants Craig, Peter V. Pappas, and Walker contend that the evidence tending to prove the mailings alleged in the indictment was legally insufficient to support their convictions for mail fraud under 18 U.S.C. § 1341.[30] The indictment charged eleven mailings, one in each of Counts Two through Twelve. The mailing alleged in the indictment and proven by the government at trial consists of the following:

| | |
|---|---|
| Counts Two to Five | — Notices and Agenda of MVLC Meetings of December 1971 and January 1972, mailed by the MVLC Secretary to McBride and Connolly. |
| Counts Six and Seven | — Dues Abatement letters from NIRMMA to Edmier, Inc. and Accurate Ready-Mix. |
| Counts Eight and Nine | — Fraudulent Expense Vouchers mailed by Arquilla and Lauwereins to NIRMMA for purposes of covering a $3160 shortage in the bribe fund. |
| Counts Ten and Eleven | — Bulletins from ID-MRCA and NIRMMA urging members to contact the Governor to urge him to sign House Bill 4176. |
| Count Twelve | — $500 cash payoff from Carpentier to Walker. |

Weiss testify yesterday, to certain deletions and processing which have been necessary. These deletions were done with the knowledge of all the parties in the case and they were proper and legal and you need not be concerned about the legal basis for these deletions or the reasons for the deletions. You should consider the entire tape and disregard the fact that they have been subjected to deletions and excisions in determining the guilt or innocence of any of the defendants in this case."

**30.** The Mail Fraud Statute provides:
"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, sup-

Our inquiry begins with *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954):

"The elements of the offense of mail fraud . . . are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme. It is not necessary that the scheme contemplate the use of the mails as an essential element. *United States v. Young*, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548 . . . ."

To support a conviction for mail fraud, the mailings must be closely enough related to the fraudulent scheme. *See Ohrynowicz v. United States*, 542 F.2d 715 (7th Cir. 1976); *United States v. Britzman*, 542 F.2d 380 (7th Cir. 1977). In determining the relationship between the mailings and the fraudulent scheme, our inquiry concerns whether the uses of the mails that were charged in the indictment and shown by the evidence properly may be said to have been for the purpose of executing the scheme within the meaning of 18 U.S.C. § 1341. *See United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *United States v. Sampson*, 371 U.S. 75, 76, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *Parr v. United States*, 363 U.S. 370, 385, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960).

The mailings charged and proven in Counts Two through Five consisted of notices and agenda of the December, 1971 and January, 1972 meetings of the MVLC. These notices were mailed to ready-mix in-

ply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

dustry representatives McBride and Connolly by the MVLC secretary, who addressed the notices from a mailing list. Connolly, the Executive Secretary of NIRMMA, had requested that NIRMMA be placed on the mailing list. Both Connolly and McBride were charged as and shown to be co-schemers with the defendants.

■ The government's evidence established that the defendants and co-schemers/co-conspirators conspired to devise a bribery scheme by which the citizens and honest legislators of Illinois would be deprived of their right to honest government. The object of the scheme was the passage of a law through the Illinois Assembly giving highway weight relief for ready-mix industry cement trucks. The record shows that the MVLC was the body which initially reviewed the proposed weight relief legislation and made recommendations to the General Assembly. Thus, the introduction in the MVLC of what eventually became the "cement bill" was a strategic and essential step, envisioned, planned and carried out by the co-schemers. The mailings of the notices of meetings of the MVLC to NIRMMA representatives, upon the request of Connolly, served to keep the industry co-schemers advised as to the status of their sought-after legislation. The record shows that after the receipt of the notices, the schemers met to prepare their presentation in support of the proposed change in the truck weight limitations law. We conclude that the introduction of the "cement" bill in the MVLC, among whose membership included Pete Pappas, Course, and Carpentier, was an essential part of the scheme. We further conclude that the mailings of the notices of the MVLC meetings to names on the mailing list maintained by the secretary were incidental to that essential part of the scheme. *Cf. Pereira v. United States, supra.* The MVLC notices were requested by Connolly of NIRMMA to keep the industry co-schemers apprised of MVLC developments with respect to the "cement bill" proposal. With such information acquired through the mail, the industry schemers' actions could be planned accordingly.

■ Although it is clear that not all of those charged with participating in the scheme knew that the notices would be mailed to persons on the MVLC mailing list in the ordinary course of the MVLC's business, those who were not aware of the mailings are nevertheless responsible for the mailings caused by other members of the scheme in its furtherance. *United States v. Joyce*, 499 F.2d 9 (7th Cir. 1974), *cert. denied*, 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974); *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), *cert. denied sub nom. Kerner v. United States*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. Keane*, 522 F.2d 534 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976).

Because the mailings represented in Counts Two through Five were incidental to an essential part of the overall scheme, and because the mailings furthered the execution of the scheme, the mailings of the MVLC notices are significantly different from the mailings found to be legally insufficient in *Parr v. United States, supra*, and *United States v. Staszcuk*, 502 F.2d 875 (7th Cir. 1974), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975), both of which cases are relied upon by defendants. *Parr* was a prosecution of school board officials for misappropriation of school tax funds. The Supreme Court held under the circumstances of that case that the legally compelled use of the mails by defendant to send tax assessments, receipts, and notices of reassessment hearings was not shown to be in furtherance of the scheme. *Parr, supra*, 363 U.S. at 391, 80 S.Ct. 1171. In *Staszcuk*, the defendant city alderman was convicted, *inter alia*, of violations of 18 U.S.C. § 1341 in requiring payments for his approval of zoning changes. The mailings charged to be in furtherance of the scheme consisted of notices of hearings sent by a zoning committee of the City Council to occupants of buildings near the property which was subject to the proposed zoning amendment. We concluded that the mailings charged and proven by the government conflicted with rather than promoted the defendant's

scheme to defraud, and, hence, were not in furtherance of the scheme. *Staszcuk, supra*, 502 F.2d at 880–881.

*Parr* and *Staszcuk* are inapplicable here. The MVLC mailings were directed to those co-schemers who had asked to be placed on the mailing list. The notices served to inform the recipients of the status of their sought-after proposal in the MVLC so that the steps necessary to secure its passage could be taken. We feel that the mailings of the MVLC notices to McBride and Connolly were closely enough related to and promoted the fraudulent scheme. As such, Connolly caused the mailings of the notices for purposes of executing the fraudulent scheme.

The mailings involved in Counts Six and Seven consist of letters from NIRMMA to its members advising them of a suspension of dues.[31] The evidence showed that at the NIRMMA convention in Miami in February, 1972, it was proposed that member companies be assessed $40.00 per truck as their contribution to the $50,000 bribe fund. At a subsequent NIRMMA Transportation Committee meeting, this plan was agreed upon and carried out. In March, 1972, the NIRMMA Board of Directors decided to abate the dues of member firms and mailed letters so informing the members of that decision. As Craig allows, the record indicates that the "reason for these letters was to soften the blow occasioned by the assessment to make up the $50,000.00 fund." (Brief of Defendant Craig, p. 20). The record shows that Accurate Ready-Mix Concrete Company (Count Six) and Edmier, Inc. (Count Seven) received these letters through the mail.[32]

The mailings which formed the basis for Counts Eight and Nine consist of false expense vouchers mailed by Arquilla and Lauwereins to the NIRMMA office. When the $50,000.00 bribe purse was assembled in the NIRMMA office in March, 1972, Meyer Material advanced $3160.00 to cover a short-age. False expense vouchers were then submitted to NIRMMA. Connolly prepared checks to pay the false expense vouchers. When cashed, Connolly reimbursed Meyer Material for the $3160.00.

■ It is clear from the record that the collection of the $50,000.00 bribery fund was an essential part of the scheme, and that the mailings charged in Counts Six through Nine were done as incidental aspects of the task of assembling the fund. Because the collection of the bribe fund was an essential part of the scheme, and because the mailings charged in Counts Six through Nine were incidental to that essential aspect of the scheme, *Cf. Pereira v. United States, supra*, 347 U.S. at 8, 74 S.Ct. 358, we conclude that those mailings were done for purposes of executing the scheme to defraud, and, as such were sufficient to support convictions for mail fraud.

■ Craig argues that the mailings of the false expense vouchers (Counts Eight and Nine) constituted an entirely different fraud perpetrated against NIRMMA. Craig claims that the mailings involved in those fraudulent acts could not have been foreseen by the defendants. We understand this contention to mean that Craig did not cause the use of the mails in Counts Eight and Nine within the meaning of § 1341. But a schemer causes the use of the mails when he has knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, although not actually intended. *Pereira v. United States, supra*, 347 U.S. at 8–9, 74 S.Ct. 358. Furthermore, each member of a mail fraud scheme is responsible for the use of the mails caused by other members in the execution of the scheme. *United States v. Joyce, supra*, 499 F.2d 9, 16.

■ Undoubtedly Craig had no concern for the methods utilized by the industry co-schemers in raising the bribe fund, prob-

---

**31.** Ostensibly the reason given in the letters for the dues abatement was a surplus in the NIRMMA treasury.

**32.** Craig challenges the proof of the use of the mails with respect to Edmier's receipt of the abatement letter. Our review of Edmier's testimony compels us to reject that challenge.

ably never intended that false expense vouchers would be submitted through the mails to assemble part of the fund, and probably could not foresee such a procedure. The same, however, cannot be said of Craig's counterparts in the ready-mix industry. The mailings were clearly caused by them, and the fact that Arcquilla and Lauwereins used the mails to submit false expense vouchers in furtherance of the fund's collection process was certainly a reasonably foreseeable use of the mail. Since the industry schemers could reasonably foresee the use of the mails in the execution of the fund-raising aspect of the scheme, and since the defendants are responsible for such use of the mails by their industry counterparts, defendants must be held responsible for the mailings represented in Counts Eight and Nine.

 . The mailings charged in Counts Ten and Eleven consist of bulletins mailed by ID–MRCA and NIRMMA directing their respective membership to contact the governor and to urge him to sign the cement bill into law.[33] Craig argues that the defendants had no contemplation that the possibility of a veto was any part of the scheme and, thus, contemplation of the use of the mails to prevent a veto could hardly have been envisioned or reasonably anticipated. In a similar vein, Peter V. Pappas argues that the mailings in Count Ten and Eleven were not sufficiently related to the scheme because the conspiracy was never alleged to encompass improper influence on the governor. These arguments miss the mark. At the time of the mailings charged in Counts Ten and Eleven of the indictment, the scheme was on the brink of fruition, at least from the point of view of the industry schemers. It was an essential part of the scheme that the cement bill be enacted into law. As such, the mailings of the bulletin to the members of the NIRMMA and ID–MRCA urging those members to press the governor to sign H.B. 4176 into law were clearly within furtherance of the

scheme and properly chargeable to the co-schemer defendants.

 Count Twelve charges the mailing of five hundred dollars to defendant Walker. It was shown at trial that Carpentier placed $500.00 in an envelope and mailed it to Walker in fulfillment of their prior agreement that Walker would receive $500.00 for handling the cement bill in the Senate. We have no difficulty in concluding that this distribution of the proceeds of the bribe fund was in furtherance of the scheme. *Cf. United States v. Barrett,* 505 F.2d 1091, 1104 (7th Cir. 1975), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Isaacs, supra.*

 With respect to each of the above mailings, which we have found to be in furtherance of the scheme, defendants Craig, Peter V. Pappas, and Walker assert variously that they cannot be said to have caused the mailings, or that they could not have anticipated such use of the mails, or that they had no knowledge of or participation in the mailings. Hence, defendants contend, the evidence of mailings is insufficient to support a conviction under § 1341. Defendants' arguments, however, ignore the principle that they do not have to use or personally cause the use of the mails in furtherance of the scheme to be held responsible under the Mail Fraud statute. As we stated previously, members of mail fraud schemes are responsible for the mailings caused by co-schemers in the execution of the scheme. When the existence of an agreement to participate in a scheme to defraud is established, and when mailings in furtherance of the scheme are caused by some of the schemers, criminal liability for the mailings is properly attributable to other schemers regardless of whether they knew of, approved, agreed to, or contemplated specific uses of the mails.

In sum, we conclude that the jury could properly find that the mailings represented in Counts Two through Twelve were effectuated for the purposes of executing the

---

**33.** Craig challenges the proof with respect to the mailing charge in Count XI, a bulletin sent to Meyer Material Company. We have re-

viewed the evidence with respect to that mailing and find that it sufficiently proves the use of the mails.

scheme, and that those mailings were caused by the defendants.

## IV. CONSPIRACY ISSUES

Defendant Peter V. Pappas contends that the district court erred in failing to incorporate in instructions defining conspiracy to commit mail fraud the requirement that the defendants intended to use the mails.[34] Because we find no such requirement, we reject this contention.

With respect to the conspiracy count, the district court instructed the jury, in part, that:

> "To convict any defendant of this offense the Government must prove beyond a reasonable doubt the existence of a conspiracy to commit the offense of mail fraud, that the defendant, with knowledge of the purpose of the conspiracy, and reasonably foreseeing a use of the mails in furtherance thereof, willfully became a member of the conspiracy . . .

> "It is necessary . . . that the government prove beyond a reasonable doubt that a defendant was aware of the common purpose, and could reasonably foresee the use of the mails in furtherance of that common purpose, and was a willing participant with intent to advance the purpose of the conspiracy . . . "

Peter V. Pappas argues that the jury should have been instructed that a defendant can be found guilty of conspiracy to commit mail fraud only if it is shown that he agreed to join the conspiracy with the knowledge that the conspiracy contemplated the *unlawful* use of the mails.

■ In support of his contention, Peter V. Pappas points to the following sentence in *Pereira v. United States, supra,* 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435: "The essence of the conspiracy charge is an agreement to use the mails to defraud . . . ." But this language in *Pereira* is mentioned in the context of a double jeopardy issue. In response to the contention

that a conviction on both substantive mail fraud counts and conspiracy to commit the crime charged in the substantive count constituted double jeopardy, the court in *Pereira* found double jeopardy no bar to a conviction on both substantive counts and a conspiracy count. The court noted that the "charge of conspiracy requires proof not essential to the convictions on the substantive offenses—proof of agreement to commit an offense against the United States—and it cannot be said that the substantive offenses and the conspiracy are identical, . . . ." *Id.,* at 11–12, 74 S.Ct. at 364. Hence, we cannot view the Court's statement that "the essence of the conspiracy charge is an agreement to use the mails to defraud" as support for the proposition that the government must prove that defendants agreed to join the conspiracy with knowledge that the conspiracy contemplated the unlawful use of the mails or that the defendants conspired intending to use the mails. Such a proposition would require proof of a mental state greater than that required for conviction of the substantive mail fraud offense. It is clear, however, that the mental state required for a conspiracy conviction is no greater than that necessary to commit the underlying substantive offense. *United States v. Zarattini,* 552 F.2d 753, 760 (7th Cir. 1977); *United States v. Mauro,* 501 F.2d 45 (2d Cir. 1974).

In its baldest terms, 18 U.S.C. § 371 makes it a crime for two or more persons to conspire to commit any offense against the United States. It is well established that the essence of the crime of conspiracy is an *agreement* to commit such an offense. See, e. g., *United States v. Donner,* 497 F.2d 184 (7th Cir. 1974), *cert. denied,* 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 641; *United States v. Greer,* 467 F.2d 1064 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590; *United States v. Fellabaum,* 408 F.2d 220 (7th Cir. 1969), *cert. denied,* 396 U.S. 858, 90 S.Ct. 125, 24 L.Ed.2d 109; *United States v. Varelli,* 407 F.2d 735 (7th Cir. 1969).

---

**34.** Defendant Walker, whose argument is adopted by defendant Craig, similarly contends that the government was required to prove that a violation of the mail fraud statute was an object of the conspiracy.

■ As indicated previously, proof of the offense of mail fraud requires a showing of a scheme to defraud and a mailing which was caused by[35] a schemer for purposes of executing the scheme. In a mail fraud prosecution, there is no need to prove the intent of the defendant to use the mails. *United States v. Tenenbaum,* 327 F.2d 210 (7th Cir. 1964), *cert. denied,* 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 177 (1964). It is sufficient to show that the mailings were in furtherance of the scheme, and were caused by the defendants. Hence, culpability for conspiracy to commit the offense of mail fraud requires only that one *agree* with others to commit the acts which constitute the substantive offense of mail fraud,[36] i. e. one must agree to participate in a scheme to defraud in which the reasonably foreseeable use of the mails in furtherance of the scheme is caused by a co-schemer/co-conspirator. We find no basis for the contention that the government must show that the mail fraud conspirators agreed to commit the forbidden acts with knowledge that the conspiracy contemplated the unlawful use of the mails.

■ By contending that the government was required to prove that the conspirators intended the unlawful use of the mails in furtherance of the scheme to defraud, Peter V. Pappas in effect contends that the government must show that the defendants had specific knowledge of the federal nature of their conspired misdeeds. Use of the mails caused by a defendant in furtherance of a scheme renders the scheme to defraud amenable to federal jurisdiction. *Compare: United States v. Blassingame,* 427 F.2d 329 (2d Cir. 1970); *United States v. Howey,* 427 F.2d 1017 (9th Cir. 1970). The mailings are thus a jurisdictional element of the offense of mail fraud. A conspirator's knowledge of the federal jurisdictional element of an offense is relevant only

to the same extent as it would be if the substantive offense alone were charged. *United States v. Feola,* 420 U.S. 671, 695, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975). We do not consider a conspirator's knowledge of the federal jurisdictional elements to be an essential, necessary element in a conspiracy to commit mail fraud. *Cf. United States v. Polesti,* 489 F.2d 822, 824 (7th Cir. 1973); *United States v. Thompson,* 476 F.2d 1196, 1198–1200 (7th Cir. 1973); *United States v. Fernandez,* 497 F.2d 730, 738–739 (9th Cir. 1974); *United States v. Iannelli,* 477 F.2d 999, 1002 (3rd Cir. 1973); *United States v. Roselli,* 432 F.2d 879, 891–892 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828.

■ We also find sufficient evidence to support defendants' convictions for conspiracy to commit mail fraud. Walker protests that the only evidence linking him to the conspiracy is Carpentier's statement that there would be "help in his district" and, later, that there would be $500.00 available to Walker in return for his vote and handling the bill. Based on our review of the record, we think the jury could properly infer from the evidence that Walker knowingly agreed to participate in the bribery scheme.

Defendant Craig's contention with respect to the conspiracy count is of a different sort. As with his contentions respecting the mailings, Craig urges that the evidence failed to sustain the charges of the indictment. Specifically, Craig points out that the briber-contractors had one concept of the scheme—payments of $50,000.00 for weight relief legislation on a no law-no pay basis—whereas the bribee-legislators had a different concept of the scheme—payment of the money as the cement bill passed each House, regardless of whether or not it ever became law. After the difference in understanding between the two groups was dis-

---

**35.** "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used. *United States v. Kenofskey,* 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836." *Pereira v.*

*United States, supra,* 347 U.S. at 8–9, 74 S.Ct. at 363.

**36.** Of course, an overt act to effect the object of the conspiracy is also required. 18 U.S.C. § 371.

covered, Craig argues, the briber-contractors independently conspired to raise the $30,000.00 fund which was used eventually to pay off the legislators. We understand Craig to argue that the evidence showed separate and distinct conspiracies rather than one overall conspiracy. So understood, the argument has no basis in the record.

■ The indictment charged one overall conspiracy by which the defendants devised a scheme to defraud the citizens of the State of Illinois of their right to loyal, faithful and honest public service. The indictment alleged as part of the conspiracy that the defendant members of the Illinois General Assembly and Peter V. Pappas agreed to accept money for the purpose of changing the weight limit laws, and that these defendants received a portion of the $30,000.00 fund. Our review of the record in this case indicates that the evidence established one general scheme, albeit a complex one. The scheme involved numerous responsibilities on the part of the conspirators to effectuate its purposes. As the statement of facts *supra* indicates, legislators in both Houses of the General Assembly had to be bribed to "handle" the purposed legislation. After the legislators indicated how much their services were worth, the ready-mix functionaries established a plan for raising the bribe fund and embarked upon a course designed to effectuate that plan. To assure the legislators that the fund was readily available, the cash was placed in a safe deposit box. After the bill passed the General Assembly, the legislator-conspirators pressed for their money. Subsequently, the money was paid.

After the governor's veto of the cement bill, the misunderstanding as to payment between the two groups of conspirators became apparent. Discussions then ensued as to a possible override of the veto. Future weight relief legislation was also discussed.

It is clear from the record that the raising of the $30,000.00 did not serve to create a separate and distinct conspiracy, but rather constituted an effort by the industry and members of the conspiracy to patch up the differences in understanding as to the distribution of the bribe fund between the two groups.

Furthermore, the jury was instructed that although the indictment charged a single conspiracy, it would be possible to find more than one conspiracy.[37] The jury found only one conspiracy as charged. We find no basis in the record for disturbing that finding. The evidence demonstrated one overall scheme in which the conspirators knowingly associated themselves, participated and sought to make it succeed.

This case is thus significantly different from *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969), both of which are relied upon by Craig. In *Kotteakos*, the government conceded the existence of several conspiracies, characterizing the conspiracies as "separate spokes meeting at a common center." The Court noted that the proof "admittedly made out a case, not of a single conspiracy but of several, notwithstanding only one was charged in the indictment" and added that the rim of the wheel to enclose the spokes was not made out. *Kotteakos v. United States, supra*, 328 U.S. at 755, 66 S.Ct. at 1243.

In *Varelli*, this Court found on the record insufficient evidence to sustain the charge of one overall conspiracy. The panel noted that the evidence demonstrated two separate conspiracies, each of which had a single purpose. As recognized and reiterated in *United States v. Bastone, supra*, 526 F.2d at 979–980, *Varelli* sets forth the test to distinguish between a single conspiracy and multiple conspiracies:

37. The district court instructed the jury as follows:

"Although the indictment charges a single conspiracy, it would be possible to find separate conspiracies, one relating to an alleged sum of $50,000.00 raised to secure passage of H.B. 4176 and the other relating to an alleged sum of $30,000.00 raised to be distributed to legislators after H.B. 4176 was vetoed by the Governor. Whether there was one conspiracy, or two conspiracies, or no conspiracy at all is a fact for you to determine in accordance with these instructions."

"While the parties to the agreement must know of each other's existence, they need not know each other's identity nor need there be direct contact. The agreement may continue for a long period of time and include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies.

The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining in terminating their relationship at different times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators, and others to achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy" (407 F.2d at 742) (citations omitted).

The evidence here demonstrates one overall agreement among the diverse parties to perform different functions in order to carry out the conspiracy's objective.

## V. TRAVEL ACT ISSUES

Counts Thirteen and Fourteen of the indictment charged the conspirators with causing Lauwereins to travel to and from Indianapolis, Indiana with intent to further the scheme to defraud. Lauwereins' travel was charged as a violation of the Travel Act, 18 U.S.C. § 1952.[38] The evidence adduced at trial demonstrated that on February 29, 1972, Lauwereins travelled from Chicago to Indianapolis to attend a meeting of ID–MRCA in order to solicit that Association's financial support in collecting the $50,000.00 bribe fund. While in Indianapolis, Lauwereins discussed the bribe fund with Chalden, Herb Craig, and other ID–MRCA members. Lauwereins returned to Chicago on the next day and continued his efforts to raise the money.

Craig contends that since he rested at the close of the government's case, and since Lauwereins was called by a co-defendant as a defense witness, who, on cross examination, testified as to his travels to Indiana to raise the bribe fund, Lauwereins' testimony may not be used against him. We reject this contention because government witness Wisner testified that he travelled with Lauwereins across state lines, and government witnesses Chalden and Herb Craig testified that Lauwereins discussed the $50,000.00 bribe fund with ID–MRCA. Other witnesses testified concerning Lauwereins' fund raising activity upon his return to Chicago.

Peter V. Pappas contends that the evidence was insufficient to show that he knowingly and willfully caused an unlawful interstate activity.[39] Specifically, Peter V. Pappas argues that the travel charged in Counts Thirteen and Fourteen was Lauwereins' own doing for his own purposes and constitutes at most a "happenstance" use of interstate travel.

---

**38.** 18 U.S.C. § 1952 provides in pertinent part:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to (1) distribute the proceeds of any unlawful activities; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3) shall be fined not more than $10,000.00 or imprisoned for not more than five years, or both.
 (b) As used in this section "unlawful activity" means . . . (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

**39.** Craig similarly contends that Lauwereins' trip "could not reasonably have been anticipated."

The use of an interstate facility or, as in this case, interstate travel, to facilitate the carrying on of unlawful activity provides a federal jurisdictional basis for crimes which would otherwise be of purely local concern. *United States v. Peskin*, 527 F.2d 71, 78 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1977); *United States v. Bursten*, 560 F.2d 779 (7th Cir. 1977). It is not necessary that a defendant reasonably foresee interstate travel for criminal liability to attach under 18 U.S.C. § 1952. *Rewis v. United States*, 401 U.S. 808, 813, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). Nor is it necessary that a defendant knowingly cause interstate travel or the use of an interstate facility. *United States v. Peskin, supra*, 527 F.2d at 78; *United States v. LeFaivre*, 507 F.2d 1288, 1297 (4th Cir. 1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). It is sufficient to show interstate travel or the use of an interstate facility with intent to promote or carry on an unlawful activity, and facts constituting the promotion or carrying on of the unlawful activity. 18 U.S.C. § 1952. Of course, where as here, a conspiracy is shown, conspirators are responsible for the acts of their co-conspirators in furtherance of the unlawful activity. *United States v. Peskin, supra*, 527 F.2d at 75; *United States v. Joyce, supra*, 499 F.2d at 16. The interstate travel under § 1952 and the subsequent acts, however, must be more "significant" than merely "incidental" or "minimal". *Cf. United States v. Altobella*, 442 F.2d 310, 315 (7th Cir. 1971); *United States v. McCormick*, 442 F.2d 316, 318 (7th Cir. 1971); *United States v. Isaacs, supra*, 493 F.2d at 1146.[40]

As noted previously, the evidence showed that the raising of the $50,000.00 bribe fund was an essential part of the conspiracy. The record further shows that the ready-mix industry association in Chicago (NIRMMA) considered it important to include the downstate ready-mix industry association in its effort to gain the weight relief legislation. It is also clear that Lauwereins travelled to Indianapolis intending to seek ID–MRCA's financial assistance in raising the necessary funds, and then returned to Chicago to continue his fund-raising efforts. Craig and Peter V. Pappas were both early participants in the scheme and were instrumental in setting the $50,000.00 figure. As co-conspirators in the scheme, they are properly accountable under § 1952 for Lauwereins' interstate travel to promote the bribe fund's collection effort. Because the collection of the $50,000.00 bribe fund was an essential part of the bribery scheme, and because Lauwereins travelled to and from Indianapolis to facilitate the collection of that fund—acts for which Peter V. Pappas and Craig are accountable as co-conspirators—Lauwereins' interstate travel cannot be considered "minimal," "incidental," or "fortuitous." Hence, we conclude on the basis of the record before us that Lauwereins travelled in interstate commerce with intent to facilitate the promotion of the bribery scheme and thereafter engaged in acts constituting the promotion of that scheme within the statutory prohibition of 18 U.S.C. § 1952.

## VI. ISSUES AS TO THE INDICTMENT

Craig contends that the indictment in the instant case should have been dismissed and judgment arrested because the indictment, based on federal criminal statutes of general applicability, violated the Speech or Debate provisions of the Federal and Illinois Constitutions. If by this contention Craig means that federal inquiry into a state legislator's criminal activity is barred by the Speech or Debate Clause of the Federal and Illinois Constitutions, such a contention cannot stand in light of *United States v. Craig*, 537 F.2d 957 (7th Cir. 1976) (*Craig II*). Any privilege assertable by a state legislator against federal inquiry is based on the doctrine of official immunity, a doctrine held by *Craig II* to be inapplicable to criminal acts.

---

**40.** *Altobella*, *McCormick*, and *Isaacs* involved the "facility in interstate or foreign commerce" aspects of § 1952. We see no reason why the "travels in interstate or foreign commerce" aspect of that statute should be treated differently.

But *Craig II* purported to rule only on evidentiary questions involving the asserted privilege. As Judge Cummings noted in the original panel decision, "only the evidentiary aspect of the speech or debate privilege is involved in this appeal." *United States v. Craig*, 528 F.2d 773, 777 (7th Cir. 1976), (*Craig I*). Judge Tone in his concurring opinion [41] indicated:

"It is unnecessary to consider the scope of [the Mail Fraud Statute and the Hobbs Act] in order to decide this appeal . . . [D]etermining whether the doctrine of official immunity shields given legislative conduct is only a preliminary step in resolving the ultimate question of whether Congress intended a statute to apply to that conduct". 528 F.2d at 784.

In reliance on Judge Tone's quoted statement, Craig argues that the federal statutes under which the state legislators were charged cannot serve as a basis for prosecution because the Illinois Constitutional Speech or Debate clause is "valid unless clearly prohibited by the federal Constitution or *specifically* pre-empted by valid federal legislation." (Brief of Defendant Craig, p. 11).[42] In substance, Craig argues that he cannot be indicted for a federal crime because he was a state legislator engaged in legislative activity at the time he allegedly committed the crime. The reason for this sacrosanctity is asserted to be the pre-eminence of the Illinois Speech or Debate Clause over federal criminal law, absent a valid Congressional expression of intent to pre-empt a state's speech or debate provisions.

■ In its simplest outline, this case involved a trial on a charge of conspiracy to engage in a scheme to defraud in which bribery played a key role. Bribe taking is not protected by the federal speech or debate testimonial privilege, *United States v.*

*Brewster*, 408 U.S. 501, 516, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), and when bribe taking is part of a mail fraud scheme involving state legislators, there is likewise no official immunity and no corresponding testimonial privilege. *Craig II*. An indictment charging a state legislator with conspiracy to commit mail fraud is not insufficient because it names a state legislator as a defendant. We find no authority, and Craig has demonstrated none to us,[43] indicating that Congress, in enacting the mail fraud statute, intended to exempt state legislators from its application. *Craig I* does not so hold.

In support of his contention Craig relies upon *Wheeler v. Barrera*, 417 U.S. 402, 94 S.Ct. 2274, 41 L.Ed.2d 159 (1974). This reliance is clearly misplaced. *Wheeler* involved a federal law providing federal funding for special programs for educationally deprived children in public and private schools. The federal law clearly evinced a specific Congressional intent that the accepting state's constitutional spending proscriptions not be pre-empted as a condition of accepting federal funds. Neither the mail fraud statute nor its legislative history indicates an expression of specific Congressional intent to exempt state legislators from the operation of the mail fraud statute.

■ Nor can the indictment here be said to strain federal-state relationships. The indictment did not call the state legislators to account for their legislative acts and motives therefor. Nor did the indictment serve to interfere with the legislative processes of the Illinois General Assembly. The indictment merely charged certain individual state legislators with violations of the federal criminal law. Under the circumstances of this case, a prosecution based

---

41. Judge Tone's concurring opinion ultimately became the *en banc* decision of this Circuit. *Craig II.*

42. The Third Circuit has rejected a similar argument in *In Re Grand Jury Proceedings (Cianfrani)*, 563 F.2d 577, 582–583 (1977).

43. Craig has cited to us two unpublished district court opinions, *United States v. Gillock*, No. CR 76–104 (W.D.Tenn.1976) and *United States v. Meyers*, No. 76–163 (W.D.Penn.1977). But those opinions purport to deal with the evidentiary privilege of a state legislator—a controversy laid to rest by the *en banc* decision of this court in *Craig II.*

on such an indictment cannot be said to strain federal-state relations anymore than the speech or debate privilege or official privilege can be said to be intended to make state legislators "super-citizens, immune from criminal responsibility." *United States v. Brewster, supra,* 408 U.S. at 516, 92 S.Ct. at 2539.

■ Craig also contends that the district court erred in granting the government's pretrial motion to strike certain portions of the indictment. The original panel decision in *Craig I,* holding the existence of a waivable state legislative speech or debate privilege, was rendered prior to trial. To comply with this decision the government successfully moved to strike those portions of the indictment pertaining to legislative acts and motives for those acts. Craig argues that the striking constituted an amendment of the Grand Jury's indictment since it changed the scheme. We do not agree. The motion to strike did not pertain to any portion of the charging paragraph of the counts, and was directed only to those portions of the indictment arguably inconsistent with the then existing state of the law in this Circuit under *Craig I.* The granting of the motion to strike did not change the scheme charged in the indictment, but rather served only to remove offensive portions. Furthermore, the striking did not act to burden the charges contained in the indictment. As such, we conclude that the granting of the motion to strike did not serve to amend the indictment.

■ Craig further argues that he was denied a fair trial when he based his defense on the testimonial privilege enunciated in *Craig I.* To avoid a possible waiver of that privilege, Craig did not take the witness stand. The *en banc Craig* decision (*Craig II*), rendered after the verdict in the instant case, served to emasculate the defense based upon a state legislator's speech or debate immunity. Craig asserts that had he known prior to trial that it would later be determined that there was nothing he could waive under the *en banc* decision, his defense would have been more aggressive.

We fail to see how Craig's defense was prejudiced by an after-trial change in the viability of the legal theory of this defense. Craig's decision to rely on the earlier panel opinion was a strategy decision which we are not inclined to review in the absence of any showing of prejudice.

## VII. OTHER ISSUES

Following the direct testimony of government witness Carpentier, defendant Walker moved for the production of statements and grand jury testimony of nine Illinois Republican State Senators. Walker asserted that the "Jencks" material (18 U.S.C. § 3500) pertaining to Carpentier indicated that Carpentier had approached the nine senators seeking their participation in the scheme. These senators were interviewed by postal inspectors during May and June, 1974. Three senators testified before the grand jury in October and November, 1974.

The memoranda of interviews by postal inspectors and the grand jury testimony sought by the motion contradicted much of Carpentier's trial testimony. All nine senators denied any agreement with Carpentier pertaining to the cement bill on the condition of "help in their district." Five of the eight [44] to whom Carpentier claimed to have sent money denied receiving it. Two senators acknowledged receipt of $100.00 in the mail, but denied knowing the source. Walker asserts that the contents of the senators' statements would have aided his cross examination of Carpentier and his decision whether to call declarants as witnesses. Walker claims that the memoranda of interviews and the transcripts of grand jury testimony were relevant exculpatory evidence to which he was entitled under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the proper remedy for the government's suppression of this relevant evidence is a dismissal of the indictment. In the context of the entire record before us (*United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *United States v. Orzechowski,* 547

---

**44.** Carpentier testified that he did not mail any currency to one senator.

**492**

F.2d 978 (7th Cir. 1977); *United States v. Esposito*, 523 F.2d 242 (7th Cir. 1975), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976)), we do not agree with Walker's contention.

 Under *Brady v. Maryland, supra*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) any exculpatory material known to the prosecutor and specifically requested by the defendant must be made available to the defense. But the evidence sought must be material, *United States v. Esposito, supra,* and must be unknown to the defense. *United States v. Agurs, supra.* While the availability of the pre-trial declarations of the nine senators may have been valuable to Walker in preparation of his cross examination of Carpentier, the record indicates that Walker was aware prior to trial of the testimonial evidence which the nine senators were capable of furnishing, and which he claimed at trial was suppressed.

Walker himself testified at trial that during the summer of 1974 he talked to every Republican senator that voted for the cement bill except one or two, and that he never talked to any senator who admitted receiving money. Furthermore, on July 12, 1974, Walker had a conversation with Carpentier in which Walker indicated that some of his senatorial colleagues were denying to the grand jury that they had received money from Carpentier. This conversation was recorded by Carpentier and was admitted into evidence at trial.

The record further shows that Walker and his counsel knew prior to trial the names of the other Republican senators who voted for H.B. 4176, and where to contact them. Nothing prevented Walker's counsel from interviewing the senators as potential witnesses in Walker's behalf. In addition to Walker's awareness of the substance of the nine senators' statements, Walker was offered the opportunity by the district judge to subpoena the senators and to conduct a hearing outside the presence of the jury to ascertain the information he sought. Walker declined the district court's offer.

In light of Walker's pre-trial knowledge of the information which he claimed the government suppressed, and in view of the district court's offer to subpoena the senators and conduct a hearing, we cannot say that the refusal of the government to make available the declarations of the nine senators deprived Walker of due process.

 Defendant North contends that the evidence adduced at trial did not prove him guilty beyond a reasonable doubt. Viewing the evidence, as we must, in the light most favorable to the government, we conclude that there was sufficient evidence from which the jury could find that North was a participant in the conspiracy and mail fraud scheme, and was accountable for the acts of his co-conspirators/co-schemers.

The evidence showed that shortly before the November, 1971 meeting of MVLC, Pete Pappas had a conversation with North in Springfield, Pete Pappas testified about their conversation as follows: "I told him that I had something going on the cement bill and it was going to be in the Commission meeting. He said, 'Fine.'"

Pete Pappas further testified that in early or mid-September, 1972, he telephoned North and "I told him of my call from Peter V. and then I told him that if he could make the meeting at the Coffeehouse, I would have something for him. He said he thought he could and I said O.K., fine." At the Coffeehouse meeting Peter V. Pappas delivered an envelope to Pete Pappas in Peter V. Pappas' car, while North was away from the car. Pete Pappas then returned to his own automobile, opened the envelope, removed ten one hundred dollar bills, exited his automobile "and walked to Pat North and gave him the ten one hundred dollar bills and then restarted a conversation about having lunch at the LaSalle Holiday Inn."

After the investigation leading to the indictment in this case began, North told Pete Pappas, in October, 1973, "It would be a good thing if we forget that we ever had that meeting on Interstate 80" (the Coffeehouse meeting). The record also demon-

strates that on June 3, 1974, postal inspectors visited and questioned North about the Coffeehouse meeting. North told the inspectors he could not recall the meeting. On the next day North told Pete Pappas of the postal inspectors' visit and that "they knew quite a bit about the meeting on Interstate 80 where the payoff was held."

North argues that the evidence against him "fits very comfortably into a legitimate theory of innocence." (Reply Brief of Defendant North, p. 3). The jury, however, found otherwise. We find no basis on the record before us to disturb that determination.

■ Both Craig and North contend that their conviction should be reversed because the prosecutors indulged in prejudicial improprieties in their closing and rebuttal arguments. Craig first argues that the government's labelling him in closing arguments as a distributor-recipient of funds was improper. Our review of the evidence suggests that this label is adequately supported by evidence in the record and constituted a fair characterization of Craig by the prosecutor.

■ Craig next contends that the prosecutor improperly commented upon his intention to assert his Fifth Amendment privilege against self-incrimination. The transcript of the challenged part of the closing argument reads as follows:

Now, going back to that tape recorded conversation with Representative Craig and Representative Pappas at the Mansion View Motel in October of 1973, Craig undisputedly admits his involvement in this case.

And, in substance, he tells Representative Pappas three times that he is not going to admit anything if he is asked about money. And, in addition to the statement that I got four and I'm not going to say anything about it, Representative Craig, you recall the tape, also said if they ask me about it, I'm not going to say. I'm not going to say I don't know because I am not going to admit the god damn money now. That is what Representative Craig said on the tape, if you recall the tape.

Now, Craig also stated, in substance, when Representative Pete Pappas mentioned that he was worried about the investigation, that the investigation he stated sure cured him, cured him of taking bribe money in the Illinois General Assembly. Now, after admitting his involvement and after explaining that he was going to deny it to the authorities, after hearing those tape recorded conversations, there can be no question that Robert Craig knowingly and willfully participated in this scheme to accept bribe money and thereby defrauded the citizens of the State of Illinois.

The prosecutor's remarks were based primarily on the tape recorded conversation between Craig and Pete Pappas. Craig's actual statement, as shown by a transcript of that recorded conversation, indicates:

If they asked me about that I don't know, I'm going to say I don't know. I don't remember anything about any of that money . . . . Cause I ain't going to admit (unintelligible) god damn money now.

Craig argues that he expressed in that conversation an intent to invoke his Fifth Amendment privilege, the exercise of which is generally exempt from comments by the prosecution in post-*Miranda* situations. *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975). However, we cannot view, as apparently Craig wishes us to, Craig's statements as an expression of desire to maintain a post-arrest silence. Rather, it is clear that the prosecutor merely commented on a statement from one conspirator to another evincing an attempt to conceal his misdeeds. In view of the entire argument, we cannot consider such comment improper.

North challenges the government's rebuttal closing argument, contending improper and prejudicial remarks in four instances. First, North argues that the government's characterization of his defense as a fabrication constituted prejudicial error depriving him of a fair trial. North, through his

counsel, admitted receiving the one thousand dollars from Pete Pappas, but defended through circumstantial evidence the receipt of the money as a campaign contribution. In his rebuttal argument, the prosecutor reviewed for the jury his understanding of the evidence offered by North to support the defense of a campaign contribution, argued that the evidence did not support the defense, and concluded:

"The facts are that Mr. North didn't treat this as a campaign contribution. It is a fabricated defense that was brought into this courtroom in an effort to get you to acquit Frank P. North."

■ Characterization of a defense as fabricated, standing alone, is no more improper than characterizing a witness as a liar. *Compare, United States v. Isaacs, supra*, 493 F.2d 1124, 1166. But where the terms "fabricated" or "lies" are used repeatedly to the point of excessiveness, the line between the "undignified and intemperate" (*Berger v. United States*, 295 U.S. 78, 85, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)) and the hard or harsh but fair may be crossed with a resultant impairment of "the calm and detached search for truth to which a criminal trial should aspire." (*United States v. Spain*, 536 F.2d 170, 175 (7th Cir. 1976)). We do not think the characterization of North's defense as a fabrication, in the circumstances of the government's rebuttal, crossed that line and became prejudicially improper.

■ Similarly, North contends that the prosecutor's characterization of defense witness Mrs. North as a liar was prejudicial error. During the trial, Mrs. North testified in behalf of her husband. On cross examination, she first stated that North did not tell her the one thousand dollars was in cash, and then, a few questions later, stated that North did tell her the money was in cash. With respect to this inconsistency, the prosecutor in rebuttal arguments, stated:

"She reached the point where she tried a little too hard to help her husband and she got caught in a lie . . . . Mrs. North realized that if she was going to

carry the ball forward, that she was going to have to tell a lie, that she got caught in."

North argues, as he did below, that the prosecutor stated to the jury his personal opinion that Mrs. North was a liar, and that this statement was prejudicial. Since there is a factual basis in the record for the prosecutor's comments, and since the record does not show an abusive and indecorous use of the term "liar" we find no prejudice from its use.

North also contends that the prosecutor's erroneous account of two events resulted in prejudicial error. The first instance pertains to the postal inspector's testimony with respect to the meeting at the Coffeehouse. Postal Inspector Greenan testified that he asked North about the meeting, but that North couldn't recall it. During rebuttal, the prosecutor stated that North denied the Coffeehouse meeting.

■ Without indulging in a discussion of the semantical differences between "inability to recall" and "denial," we feel that the use of "denial" was not an inappropriate characterization of North's statements to the postal inspector. The record showed that prior to the interview with the postal inspector, North told Pete Pappas, "It would be a good thing if we would forget that we ever had that meeting on Interstate 80." Further, on the day after the interview, North mentioned to Pete Pappas that the postal inspectors "knew quite a bit about the meeting on Interstate 80 . . ." In view of this evidence, the prosecutor properly drew the inference that North denied the Coffeehouse meeting.

Finally, North claims prejudicial error in the prosecutor's account of a conversation between Pete Pappas and North. Pete Pappas testified that on November 8, 1971, he had a conversation with North. Pete Pappas related: "I told him that I had something going on the cement bill and it was going to be in the Commission meeting." North responded: "Fine".

■ During rebuttal argument, the prosecutor stated a concededly erroneous

version of that conversation: ". . . North was told by Pete Pappas 'there will be something for you on the cement bill,' or 'there is something for you on the bill,' . . . ." North sought to no avail to have the trial judge correct this misstatement.

The prosecutor's remark, adding the "for you" to the "something," was clearly a misstatement of Pete Pappas' testimony. Yet, under the circumstances in which the misstatement was made, we do not find it to have been so prejudicial as to warrant reversal. The jury had heard Pete Pappas' testimony. The prosecutor correctly recited Pappas' testimony with respect to the conversation with North in the opening portion of his closing argument. North's own counsel correctly reiterated the substance of the conversation in his closing argument. Furthermore, immediately after this misstatement, and after a brief recess, the district court admonished the jury:

> "It is the law that lawyers who argue their respective sides of the case have the right to comment on the evidence, interpret it as they see it. However, what they say is not evidence and their comments do not make true what they claim is true. It is for you to decide, from all the evidence you have heard, what are the facts."

The district court repeated a substantially similar admonition in his final charge to the jury. Under these circumstances, we find no prejudicial error in the prosecutor's misstatement.

Craig also contends that the district court erred in allowing the government over objection to call the United States Attorney (Sam Skinner) as a witness. Craig argues that Skinner's testimony enabled the government to enhance or vouch for the veracity of those witnesses who were given immunity. Skinner testified in substance that the grand jury's investigation had become bogged down in May, 1973, and that it

became necessary to grant immunity to Material Service Corporation and its employees to further the investigation. The government contends that it offered Skinner's testimony in response to statements made by defense counsel during the *voir dire* examination of the jurors, in opening statements to the jury, and during cross examination of non-immunized witnesses. The result, the government argues, was the creation of the impression in the minds of the jurors that certain persons were free from prosecution for some nefarious and unjustifiable reasons.[45]

While we condemn the unusual practice of calling the United States Attorney to offer testimony explaining the motivation for granting immunity to certain persons involved in a case, we conclude that Skinner's testimony, although irrelevant, did not constitute reversible error under the circumstances of this case.

 We note, first, that defense counsel on several occasions insinuated that the granting of immunity was tinged with impropriety. Secondly, the district court properly instructed the jury as to immunity and how it should be considered. In view of the controversy over the granting of immunity created by defense counsel, and in view of the fact that the jury was properly instructed as to the nature of immunity, we feel that the district court did not err in allowing the government to call the United States Attorney as a witness. In so finding, however, we do not wish to intimate that we condone such practice. Where a witness is immunized, the government can fairly expect vigorous, adverse inquiry and attack on the credibility of immunized witnesses by defense counsel. But where, as here, the early stages of the trial were so imbued with an aura of impropriety over the grants of immunity—an aura created not through cross examination of immunized witnesses, but through argumenta-

---

**45.** Early in the trial, one juror presented the following written question to the trial judge: "Since we are hearing the trial of eight people, not including Lester Crown, I am concerned with the fact that Mr. Coghlan has placed great importance upon the immunity granted to Mr. Crown. Can we expect the lawyers for the prosecution to tell us why this immunity was given?"

tive statements during voir dire, opening remarks, and in cross examination of non-immunized witnesses—we cannot say that the district court erred in allowing the government to meet these insinuations of impropriety through the testimony of the United States Attorney.

North also contends that the jury reached a legally and factually inconsistent verdict with respect to him. This argument, however, has been rejected on previous occasions by this court, and we reject it here. *E. g. United States v. Serlin*, 538 F.2d 737, 747 (7th Cir. 1976); *United States v. Greene*, 497 F.2d 1068, 1085-86 (7th Cir. 1974); *United States v. Tankersley*, 492 F.2d 962 (7th Cir. 1974).

North further claims that his sentence was excessive.[46] We find nothing in the record indicating an abuse of discretion by the district court in sentencing North and, accordingly, reject this claim.

North also claims that the verdict as to him was void because the district court clerk's misreading[47] of the verdict form followed by a polling[48] of the jury revealed the jury's confusion as to the North verdict which should have been resolved prior to the discharge of the jury.

■ Whatever the effect of the clerk's misreading we have no occasion to consider, for it is clear that the verdict was correctly published as to the conspiracy count. Since the sentences imposed on North were to run concurrently, reversal on the claimed error would result in no practical difference. *Cf. United States v. Holtzman*, 440 F.2d 923, 927 (7th Cir. 1971). Accordingly, we deem it unnecessary to consider North's claim.

North further contends that reversal of his conviction is required because the prosecutor's cross examination of his wife, Shirley North, was prejudicial. We have reviewed the transcript with respect to this contention and find no error warranting reversal.

Prior to trial, North moved the district court for an order dismissing the indictment and/or suppressing all evidence obtained or derived as a result of a plea agreement between the government and Pete Pappas.[49] North contends first that the proceedings before Judge Morgan violated the doctrine of separation of powers, thus depriving him of an independent judiciary and, secondly, that the plea proceedings were an improper use of the judiciary to convert Pete Pappas into a government witness.

■ We find nothing in the record of the proceedings[50] before Judge Morgan indicating that the plea agreement and subsequent acceptance by Judge Morgan were improper or illegal. The agreement contemplated that Pete Pappas, a resident of Rock Island, Illinois, was to be charged with a criminal tax violation in the Southern District of Illinois, where Judge Morgan presides. While the details of the agreement were disclosed to Judge Morgan, who viewed them approvingly, Judge Morgan did not participate in any of the negotiations resulting in the agreement. The proceedings were recorded, and copies of the transcripts were made available to the defendant. The district court properly denied the motion to suppress and/or dismiss the indictment.

**46.** The district court sentenced North to four concurrent three-year terms of imprisonment on each of the four counts for which North was convicted. North was also fined $5000.00 on the conspiracy count.

**47.** When the district court clerk read the verdict form he left the impression that North was found guilty only as to Count One, the conspiracy charge. In fact, the jury had found North guilty on Counts Ten, Eleven, and Twelve in addition to Count One.

**48.** Individual jurors were polled as to their entire verdict regarding all eight defendants, not as to each verdict.

**49.** The factual basis for North's contention with respect to Pete Pappas' plea negotiations is set forth *supra*, in the text surrounding note 16 in Pt. II.

**50.** The transcripts of proceedings before Judge Morgan were filed in the District Court in this case and are part of the record on appeal.

At trial, under the provisions of 18 U.S.C. § 3500(c), the government tendered the prior statement of witness Pete Pappas to the district court for an *in camera* inspection to determine the relationship of those statements to Pappas' direct testimony. Judge Leighton reviewed the statements and ruled that the statements did "not pertain to the subject matter of this case." Pappas' statements have been transmitted to this Court, and North has requested us to review the district court's ruling. We have complied with this request, and find no error in the district court's ruling.

The judgments of conviction are affirmed.

Affirmed.

SWYGERT, Circuit Judge, dissenting.

This case follows a pernicious trend that has been developing in our federal criminal jurisprudence over a long period of time: the extension of federal jurisdiction beyond anything intended by Congress when it enacted the various provisions of the Criminal Code. (Only the Supreme Court seems to have recently called a halt, *e. g., United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *Rewis v. United States*, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).) The trend I speak about is not confined to the mail fraud statute and the federal travel act,[1] but in this dissent I shall confine my attack on the overextension of federal jurisdiction to these two statutes because they are the ones involved in this case.

I wish to make one thing clear at the outset. The scheme to defraud in this case was of large magnitude. It was also pervasive, involving members of both houses of the Illinois legislature and of both major political parties. The defendants and their unindicted coschemers perpetrated a corrupt fraud upon the citizens of Illinois. Vigorous prosecution was called for. But as large and perverse as the scheme was, it did not constitute violation of either the federal mail fraud or travel act statutes.

I

In *United States v. Joyce*, 499 F.2d 9, 23 (7th Cir. 1974), I voiced the view that the Government had stretched the mail fraud statute to the breaking point by using mailings which were at best only tangentially related to the fraudulent scheme. I reluctantly concurred in an affirmance in that case. Here the mailings used to sustain the convictions have gone beyond the breaking point. To affirm is to extend impermissibly the scope of federal criminal jurisdiction.

A

As illustrated by the majority's opinion, federal courts have increasingly given the mail fraud statute[2] a very expansive interpretation. But in their zeal to convict the guilty, these courts have blurred a very important distinction between the two elements of the offense of mail fraud. I concur in the view that the first element—the scheme to defraud—should be liberally and broadly interpreted so as to cover the many unforeseen and diverse kinds of fraud which may be devised. I am equally convinced, however, that the second element—use of the mails—ought to be interpreted strictly and narrowly. This strict interpretation is necessary not only because the mailings provide the basis of federal jurisdiction, but also because such an interpretation comports with the limited scope of the statute.

The purpose of the mail fraud statute, first enacted in 1872,[3] was limited to pro-

---

1. This trend is also visible in prosecutions under the Hobbs Act, *United States v. Amabile*, 395 F.2d 47, 54 (7th Cir. 1968) (Swygert, J., dissenting); *United States v. Battaglia*, 394 F.2d 304, 318 (7th Cir. 1968) (Swygert, J., dissenting); and conspiracy, *United States v. Hoffa*, 367 F.2d 698, 716 (7th Cir. 1966) (Swygert, J., dissenting).

2. 18 U.S.C. § 1341.

3. Act of June 8, 1872, ch. 335 § 301, 17 Stat. 323. Although the statute has been amended on several occasions, these amendments have made only insignificant changes in wording; the provision has always prohibited schemes to defraud involving use of the mails "for execu-

tecting the postal service rather than providing a weapon against every fraud perpetrated in the states. Although the legislative history of the statute is sparse, it is important to note that the provision was placed within the chapter entitled, "An Act to revise, consolidate, and amend the Statutes relating to the Post-office Department." That Congress was concerned with the misuse of the postal service, as distinguished from the prevention of schemes to defraud as such, is shown by its insertion of the following language in the original enactment:

> [T]he court . . . shall proportion the punishment especially to the degree in which the abuse of the post office establishment enters as an instrument into such fraudulent scheme and device.

The first judicial decisions interpreting the statute confirmed the limited congressional purpose. In *United States v. Jones*, 10 F. 469, 470 (S.D.N.Y.1882), the court noted, "[T]he gist of the offence consists in the abuse of the mail." In *United States v. Loring*, 91 F. 881, 883, 887 (N.D.Ill.1884), the court was more specific:

> [T]he right to punish a person who uses the mails for purposes of fraud . . . is the scope and intent of [the mail fraud statute].
>
> \* \* \* \* \* \*
>
> The object of the law was to prevent persons having fraudulent designs on others from using the post office as a means of effectuating such fraud.

This court has adopted a like interpretation. In *United States v. Browne*, 225 F.2d 751, 757 (7th Cir. 1955), Chief Judge Major declared:

ting such scheme[s]." *See* Note, *Survey of the Law of Mail Fraud*, 1975 U.Ill.L.F. 237, 239.

4. In *Cochran v. United States*, 41 F.2d 193, 197 (8th Cir. 1930), the Eighth Circuit declared:
The use of the post office establishment in the execution of the alleged scheme to obtain money by false pretenses is the gist of the offense which the statute denounces, and not the scheme to defraud.
*See also United States v. Anderson*, 466 F.2d 1360 (8th Cir. 1972); *United States v. Lynn*, 461 F.2d 759, 762 (10th Cir. 1972); *Milam v. United States*, 322 F.2d 104 (5th Cir. 1963),

In any event, it is not the scheme to defraud which the federal statute condemns but only the use of the mails in its execution. It is that use which constitutes the *corpus delicti* of the offense. *See United States v. Aldridge*, 484 F.2d 655, 660 (7th Cir. 1973); *United States v. Lowe*, 115 F.2d 596, 598 (7th Cir. 1940), *cert. denied*, 311 U.S. 717, 61 S.Ct. 441, 85 L.Ed. 466 (1941); *United States v. Minnec*, 104 F.2d 575, 577 (7th Cir.), *cert. denied*, 308 U.S. 577, 60 S.Ct. 94, 84 L.Ed. 484 (1939); *Worthington v. United States*, 64 F.2d 936, 938 (7th Cir. 1933). Other circuits have adopted a similar interpretation.[4]

That the essence of the federal offense is the abuse of the postal service and not the scheme to defraud is further shown by the fact that counts are related to the number of mailings involved, not the number of schemes. *United States v. Aldridge*, 484 F.2d 655, 660 (7th Cir. 1973); *United States v. Browne*, 225 F.2d 751, 757 (7th Cir. 1955). This is because the offense against the United States is the misuse of the mails and the injury is sustained as soon as the mailing occurs. *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916); *In re Henry*, 123 U.S. 372, 374, 88 S.Ct. 142, 31 L.Ed. 174 (1887). *Cf. Ebeling v. Morgan*, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915). The point is obvious. If prevention of schemes to defraud were the primary purpose of the mail fraud statute, then the converse would be true: a defendant could be convicted only on the number of schemes he had devised, not on the number of mailings.[5]

*cert. denied*, 377 U.S. 911, 84 S.Ct. 1174, 12 L.Ed.2d 181 (1964); *Rosenberg v. United States*, 120 F.2d 935, 937 (10th Cir. 1941).

5. Similarly, this court has held that neither the ultimate success of a fraudulent scheme nor the actual defrauding of a victim is crucial to a successful prosecution. *United States v. Keane*, 522 F.2d 534, 545 (7th Cir. 1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). Again, this can be true only because the federal offense is the misuse of the mails and therefore the injury is complete when the defendant uses the mails.

But the statute is even more restrictive than just proscribing the use of the mails. It requires that the mailings be "for the purpose of executing such scheme." Though the mailings do not have to be fraudulent in themselves they, nonetheless, must be "sufficiently closely related to [the defendant's] scheme to bring this conduct within the statute." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). The statute requires, therefore, a close and substantial nexus between the mailings and the fulfillment of the scheme.[6] A number of formulations make the point: "[U]sing the post office as a means of effectuating such fraud," *United States v. Loring*, 91 F. 881, 887 (1884); "[T]o prevent the post office from being used to carry [the fraud] into effect," *Durland v. United States*, 161 U.S. 306, 314, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896); The mails must be used "as a central, necessary instrumentality in [the scheme's] perpetration," and play "an indispensible role," *United States v. Maze,* 414 U.S. at 408–09, 94 S.Ct. at 652 (White, J., dissenting); The mails must be "a step toward receipt of the fruits of the scheme," *United States v. Staszcuk*, 502 F.2d 875, 880 (7th Cir. 1974), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). In sum, a causal relation must exist between the mailing and the execution of the scheme.

The majority acknowledges that the mailings must be "in furtherance of" the scheme, but then fails to demonstrate how the mailings listed in the indictment actually fulfilled that requirement. Instead it uses an incorrect test: the mailings were "incidental to an essential part of the scheme." This test, standing alone, is wholly insufficient. It leaves out the necessary causal relation. Any mailing can be incidental to the scheme; yet it may not further its execution. The flaw in the majority's test is that the "essentiality" element is misplaced. The mailing must be essential to the execution or furtherance of the scheme. It matters not whether it relates to an essential element of the scheme because all the essential elements of a fraudulent scheme must exist *a priori* before a determination of the sufficiency of the mailings can be made. To use the majority's terminology, the mailing must be an essential incidence of the *furtherance* of the scheme, that is, of putting it into effect (not incidental to an essential element of the scheme).

Congress could have drafted a much broader statute than it did.[7] But it did not do so. Rather, Congress intended only to combat a certain, limited type of fraud.

> The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law. *Kann v. United States*, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944).

Because the mail fraud statute reaches only a use of the mails which is essential to the execution of the scheme, a careful diagnosis

---

**6.** In *Maze*, the Supreme Court reviewed its prior mail fraud decisions and explained the differing results on the degree of connection between the mailings and the execution of the scheme. For example, in *Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the conviction was affirmed because the mailing "played a significant part in enabling the defendant in that case to acquire dominion over the $35,000." 414 U.S. at 401, 94 S.Ct. at 649. In contrast, the convictions in *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960) and *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), were reversed because the mailings were "immaterial" to the consummation of the schemes. 414 U.S. at 400, 401, 94 S.Ct. 645. The defendant's conviction was also reversed in *Maze* because the success of the scheme did not depend in any way on the mailings. *Id.* at 402, 94 S.Ct. 645.

**7.** Congress could have drafted the mail fraud statute so as to require only that the mails in fact be used. *United States v. Maze*, 414 U.S. 395, 405, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). *See also Badders v. United States*, 240 U.S. 391, 393, 36 S.Ct. 367, 60 L.Ed. 706 (1916). Or, using the commerce clause, Congress simply could have prohibited fraud as a class of activities affecting interstate commerce without any use of the mails. *Cf. Perez v. United States*, 402 U.S. 146, 150, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971).

of each mailing is necessary. Upon that diagnosis depends the jurisdiction of a federal court to convict one who has devised a scheme to defraud. The temptation to adopt a cavalier attitude once a fraudulent scheme is shown to have existed must be resisted. The trend to extend federal jurisdiction haphazardly so as to convict the guilty at all costs must be stopped. States have the ability and resources to prosecute those who perpetrate fraudulent schemes against their own citizens.

Against this backdrop, I now turn to an analysis of the individual mailings.

B

To reiterate, the mail fraud statute requires that there be a scheme to defraud and a mailing. *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954). But to support federal jurisdiction, the mailing element further requires that: (a) the defendant "cause" the use of the mails, and (b) he use the mails "for the purpose of executing" the scheme. *United States v. Maze,* 414 U.S. 395, 399, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974). One causes the mails to be used when he "does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended . . . ." *Pereira, supra.* To meet the second requirement, the mailings must "further," "aid," or be a "step toward" the fulfillment of the scheme. The mailings in the present case cannot be said to further the scheme, or in some instances, be said to be caused or foreseen by the defendants.

### (1) *Counts Two through Five: MVLC Notices*

The mailings which formed the basis for the convictions on Counts Two, Three, Four, and Five were notices and agenda of the December 1971 and January 1972 meetings of the Motor Vehicle Laws Commission (MVLC) which were mailed to ready-mix industry representatives Connolly and McBride, two unindicted coschemers. Because the purpose of the scheme ·was the enactment of a new weight law for cement trucks, it cannot be doubted, as the majority observes, that submission of the proposed legislation in the MVLC was an important step in the scheme. Nor is there any question that Connolly and McBride caused the mailings.[8] It cannot be said, however, that these mailings furthered the scheme.

It was entirely immaterial whether McBride and Connolly received written notices of future MVLC meetings. As they were present at the committee meetings,[9] they could hear the announcement when the committee met next. Moreover, the MVLC met on a regular basis[10] and a key Government witness testified that these notices are "not necessarily" received before the next meeting. Because there was no need for any notice, no reliance upon the receipt of the notice through the mails, and no reliance upon the notice itself, these mailings were not in furtherance of the scheme and were not sufficiently related to it to bring them within the statute. These mailings cannot be considered "a step toward receipt of the fruits of the scheme." *United States v. Staszcuk,* 502 F.2d at 880.

The majority's effort to distinguish *Parr v. United States,* 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), is a combination of illogic and irrelevancy.[11] One has only to

---

**8.** The parties dispute whether the MVLC is required by law to send these notices or does so merely as a courtesy to interested persons. Resolution of the issue is irrelevant in light of *United States v. Staszcuk,* 502 F.2d 875, 880 n.11 (7th Cir. 1974), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975).

**9.** Also present at the MVLC meetings were defendants Peter V. Pappas, Craig, Wille, and Chalden, and coschemer Lauwereins.

**10.** MVLC met on the second Monday and, if necessary, the second Tuesday of every month.

**11.** *Staszcuk* also is not inapposite as the majority contends. As in *Staszcuk,* "[t]he purpose of the notices was to provide an opportunity for affected persons to state objections to the proposed [legislative] changes." 502 F.2d at 880. As in *Staszcuk,* parties did come as a result of the notices to state their objections to the bill

look at the notices themselves to see how remote they are from the scheme, or perhaps better to say, how utterly innocuous they were. *See* Appendices A and B.

(2) *Counts Six and Seven: Waiver of NIRMMA Dues*

Counts Six and Seven are duplicate letters sent to the members of the Northern Illinois Ready-Mix and Materials Association (NIRMMA). The letters simply informed the members of the association that dues would be suspended for three months because of the large reserves accumulated in NIRMMA's treasury. *See* Appendix C.

During the NIRMMA annual convention in Miami Beach in February 1971, several members of the association, including Connolly, met to discuss the raising of the $50,000 demanded as a bribe for the passage of the so-called "cement bill." Connolly suggested that the dues of the association members be suspended for a period of time to compensate partially those members contributing to the fund. On March 9, NIRMMA's board of directors moved to suspend the dues payments of members for three months to reduce the reserve monies of the association and to compensate in part the members contributing to the fund.

Given this background, it must be noted that the $50,000 fund was not derived from funds of any of the NIRMMA companies.[12] The waiver of the dues, however, benefitted the companies, not the individuals who provided the funds. Moreover, the waiver extended to all members of the association whether or not their officers had contributed to the fund. Finally, the dues suspension was not rescinded with the return of the $50,000 fund to its contributors.

The majority says: "It is clear from the record that the collection of the $50,000 bribery fund was an essential part of the scheme and that the mailings were done as incidental aspects of the task of assembling the fund." This facile pronouncement does not meet the issue. The letters forming the basis of Counts Six and Seven may have been "incidental" to the raising of the bribe fund, but they do not meet the *Staszcuk* test. How can it possibly be maintained that the suspension-of-dues letters in any way furthered the scheme? If anything, they were merely bookkeeping devices to offset the internal accounts of the association members. Even this is a loose description. Certainly they were not an integral part of the execution of the scheme which was well under way when the letters were written. If the Government had produced letters mailed to solicit the $50,000 fund, it would be on more solid ground. But when it uses internal communications between the association members that are only incidental to and not in furtherance of the scheme, it reaches for a straw. If mail fraud cases are to be built on such flimsy foundations, then the distinction between mere incidental use of the mails and the use of the postal facilities to further the execution of the scheme to defraud disappears.

(3) *Counts Eight and Nine: Fraudulent Expense Vouchers*

When the $40 per truck assessment of the NIRMMA members proved to be insufficient to raise the $50,000 bribe fund, the $3160 deficit was made up by coschemers Wille and Moeller. To reimburse them for this outlay, false expense vouchers were submitted by Bernard Arcquilla and Morris Lauwereins to Connolly of NIRMMA. The cash generated by these vouchers was turned over to Connolly who in turn reimbursed Wille and Moeller. The mailings of these two expense vouchers form the basis

(here, the State Police and the Department of Transportation). Therefore, as in *Staszcuk*, the purpose of the mailings conflicted with rather than promoted defendants' scheme to defraud.

12. For example, Wiggington supplied $1600 from fees collected for the use of a company's scale. Arcquilla supplied $1020 from personal funds, Moeller contributed $8200 from personal funds, and Lester Crown supplied $8000 from his personal safe.

of Counts Eight and Nine. *See* Appendices D and E.

It can readily be seen that this operation was a side swindle to defraud NIRMMA concocted by industry schemers Connolly, Wille, Moeller, Arcquilla, and Lauwereins. The mailings of the vouchers may well have been in furtherance of this separate scheme (to benefit themselves at the expense of NIRMMA), but they were only incidental and peripheral to the scheme to defraud the public by using bribery to pass the cement bill. The vouchers, much less their mailing, were not essential to the success of the scheme and were not an integral part of its execution. The following diagram brings home the point.

Peter V. Pappas

The diagram illustrates my difficulty in understanding how the appellants here, the legislative schemers, can be said to have caused the mailings of these two false expense vouchers. How can it be said that the legislative schemers could have reasonably foreseen that an entirely different fraud would be perpetrated against NIRMMA? How can it be said that they could have reasonably foreseen that the industry schemers would use and mail false vouchers to assemble a small part (6%) of the fund? I am fully aware that the law of conspiracy holds each member responsible for the use of the mails caused by other members. But to blindly apply this principle to a case such as this is to exhalt fiction over reality. I believe that the Counts Eight and Nine mailings fall within the ambit of *Pereira v.*

*United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), as too remote and unforeseeable.

### (4) *Counts Ten and Eleven: Trade Association Bulletins*

The mailings which were the subject of Counts Ten and Eleven consisted of bulletins mailed by two ready-mix industry associations, Northern Illinois Ready-Mix and Materials Association (NIRMMA) and Illinois Division-Midwest Ready-Mix Concrete Association (ID–MRCA), informing their members of Senate passage of H.B. 4176 and urging them to contact the Governor to sign the bill.[13] *See* Appendices F and G. Whether these otherwise innocuous trade bulletins can be said to be "in furtherance of the scheme" depends on how the scope of the scheme is defined.

As the majority notes, the ultimate goal of the ready-mix industry was the enactment of a new weight law for cement trucks. There was nothing improper or illegal in seeking such an objective; indeed, one of the major purposes of trade associations is to obtain favorable legislation. This activity includes lobbying efforts such as urging members to contact the Governor.

What was corrupt about the instant conduct was the bribery of the legislators.[14] This was the fraud perpetrated upon the citizens of Illinois, not the passage of a new weight law.[15] These considerations lead to the inescapable conclusion that these mailings were not an integral part of the execution of the scheme to defraud and were not in furtherance of its execution. Under the *Maze* test, they were not sufficiently related to the scheme to come within the mail fraud statute.

13. The ID–MRCA bulletin also urged its members to write the Governor concerning H.B. 4177, legislation not subject to the bribery scheme. *See* Appendix F.

14. That the illegal scheme was limited to passage of the law in the two houses is supported by the fact that the bribes were paid, though in

lesser amounts, *after* the Governor vetoed the bill.

15. This conclusion is supported by the fact that the Government neither alleged nor proved that the object of the conspiracy was to influence unlawfully the Governor or his staff.

**(5)** *Count Twelve: Mailing of $500 in Cash to Walker*

H.B. 4176 was passed by the Illinois House of Representatives on May 12, 1972. It was introduced in the Illinois Senate three days later. Shortly thereafter Carpentier spoke with ten Illinois Republican senators. One was Jack E. Walker. Carpentier asked Walker to support the cement bill, saying ambiguously "that there would be help in his district." In mid-June 1972 while the bill was pending in the Senate, Carpentier told Walker that Senator Harris could no longer sponsor the bill because Harris was ill. Carpentier then told Walker that if Walker would handle the bill, "an additional $500 would be given him." Walker agreed to handle the bill.

Carpentier testified that in September 1972 he received $5000 in $100 bills from Pappas. He said that a few days later he had his wife type the addresses of nine senators on plain envelopes. He further testified that using the cash supplied by Pappas, he placed a $100 bill in each of eight envelopes and five $100 bills in an envelope addressed to Walker, and that he then mailed these envelopes. Walker testified at the trial and denied that he was offered money or that he received any money in connection with the bill.

At trial the Government introduced an envelope mock-up,[16] *see* Appendix H, apparently realizing that its proof of mailing was on extremely shaky grounds: the assertion by Carpentier that he had mailed $500 in cash in a plain envelope to Walker juxtaposed against Walker's denial that he had been promised or had received any money. There being no corroborating evidence, the proof of the use of the mails to further this vast scheme, convicting numerous defendants on this count, boils down to one man's word against another's.

Despite the fact that the proof rested on quicksand, the majority says with seeming assurance: "It was shown at trial that Carpentier placed $500.00 in an envelope and mailed it to Walker in fulfillment of their prior agreement that Walker would receive $500.00 for handling the cement bill in the Senate. We have no difficulty in concluding that this distribution of the proceeds of the bribe fund was in furtherance of the scheme." It is true that the distribution of part of the bribe to Walker, if it occurred, was in furtherance of the scheme, but that does not make its delivery, as asserted by Carpentier, through the postal service, a use of the mails as contemplated by the statute. It was a fortuitous, unforeseen circumstance. In other words, it was a sport in the totality of the scheme—not an integral part of its execution or an incident essential to its success. To hold that these convictions on charges for using the mails to defraud should depend on this weak thread is to say that the most attenuated use of the post office is sufficient under the statute.

II

The flaw in the majority's diagnosis of the convictions on the two travel act counts[17] is similar to that in the mail fraud counts. My colleagues, ignoring the limited congressional purpose of the act, stretch the statute beyond recognition and extend unduly federal jurisdiction to prosecute what was essentially a state crime.

The congressional purpose of the travel act was to attack criminal activities extending beyond the borders of one state by providing federal assistance in situations in which local law enforcement was ineffective. *United States v. Nardello*, 393 U.S. 286, 290–92, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969). *See also Erlenbaugh v. United States*, 409 U.S. 239, 245–46, 93 S.Ct. 477, 34

---

**16.** Interestingly, the envelope mock-up is addressed to 18018 Arcadia Avenue. Count Twelve of the indictment charges a mailing to 18225 Burnham Avenue.

**17.** Count Thirteen charged the defendants with Lauwereins' trip to Indianapolis on February 29, 1972, and Count Fourteen charged them with his return trip to Chicago the next day.

L.Ed.2d 446 (1972). The statute was aimed primarily at organized crime and, in particular, at persons who reside in one state while operating or managing activities located in another. *Rewis v. United States*, 401 U.S. 808, 811, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971). I concur with the view that the scope of the statute is not limited to the original congressional purpose, *i. e.*, organized criminal activity operating interstate. *See United States v. Peskin*, 527 F.2d 71, 76–77 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). As with the mail fraud statute, the alleged criminal activity should be viewed broadly. But, as with the mail fraud statute, Congress did not intend a broad-ranging interpretation of section 1952. The interstate travel aspects should be scrutinized narrowly. Otherwise, federal jurisdiction is extended to situations never intended by Congress. *Rewis, supra*, 401 U.S. at 812, 91 S.Ct. 1056.

The test for application of section 1952 is the nature and degree of interstate activity in furtherance of the state crime. *United States v. Isaacs*, 493 F.2d 1124, 1148 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). As the majority concedes, that degree of interstate travel or activity must be more than minimal or incidental; the statute was intended to reach only significant interstate activity. *Isaacs, supra* at 1146; *United States v. Altobella*, 442 F.2d 310 (7th Cir. 1971); *United States v. McCormick*, 442 F.2d 316 (7th Cir. 1971).

There was no significant interstate activity in this case. The defendants' activities were all local: Illinois residents, corporations, and trade associations seeking to bribe Illinois legislators to obtain a new Illinois law. There is no evidence in this record of any interstate activity with the single exception of Lauwereins' one trip to Indianapolis.

Lauwereins, an unindicted coschemer, travelled from Chicago to Indianapolis to meet with members of the Illinois Division-Midwest Ready-Mix Concrete Association (ID–MRCA), who were attending an annual convention there. The purpose of his trip was to inform them of the $50,000 bribe and to seek their support in raising the money. When the ID–MRCA refused to help, Lauwereins returned to Chicago.

There is no showing that the bribery scheme in any way depended on this one incident of interstate travel. That the members of the ID–MCRA were meeting in Indianapolis was completely fortuitous.[18] The assistance of ID–MRCA was not even necessary or essential to the scheme as the $50,000 bribe was raised without its help.[19]

This one trip cannot suffice to invoke jurisdiction under the travel act. The scheme involved here was outside the ambit of congressional concern—there is nothing about the scheme which suggests any reason why state police powers needed to be supplemented by the federal government. I would therefore hold that the interstate activity was "so minimal, incidental, and fortuitous, and so peripheral" to the scheme, *Isaacs, supra* at 1146, that it was error to submit these counts to the jury.

### III

Little need be said about Count One, the charge of conspiracy to use the mails to

---

**18.** The Midwest Ready-Mix Concrete Association has both Illinois and Indiana divisions. The annual convention alternates between the two states.

**19.** *United States v. Peskin*, 527 F.2d 71 (7th Cir. 1975), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976), upon which the Government relies, is therefore distinguishable. In *Peskin*, it was essential that the defendant receive money to make the bribes. To obtain the money, the check had to clear the Detroit bank where it was drawn. Furthermore, the court in *Peskin* noted that the interstate scope of the unlawful activity was "clear." *Id.* at 78.

The recent case of *United States v. Burstein*, 560 F.2d 779 (7th Cir. 1977), is also distinguishable. As in *Peskin*, the interstate clearance of the checks was "essential to the carrying on of the illegal activity." *Id.* at 783.

defraud. Where proof of the mailings is insufficient to establish the substantive counts and the alleged conspiracy was to commit the same offenses as charged in those counts, then the insufficiency of the mailings carries over to the conspiracy charge. *Parr v. United States,* 363 U.S. 370, 393, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). Equally important is the fact that the record is completely bare of evidence that any of the defendants or their co-schemers ever contemplated, agreed or intended to use the mails to further the execution of their scheme to defraud the citizens of Illinois.

I conclude by depicting a scenario which I have little doubt approximates the facts of this prosecution. Federal officials, getting wind of a deal between the Illinois state legislators and the ready-mix cement industry, assign agents to investigate. In due course, immunity is promised to some of the involved legislators and company officials in return for their cooperation and testimony. Recording devices are placed on some of the immunized persons to obtain inculpating admissions from those who are the targets of the prosecution. Once the investigation is completed, consideration is then given to what federal offense, if any, has been committed. The mail fraud statute? The federal travel act? The investigation files are searched to find some mailings or evidence of interstate travel. The United States Attorney's office sifts through the mailings in the file and then constructs a legal theory in order that they may be used to form the basis for a charge of mail fraud. One fortuitous trip, totally incidental and unforeseen, by an unindicted coschemer forms the basis of the two travel act counts. A conspiracy count is, of course, added. In this fashion, the mail fraud statute and the travel act are subverted to purposes for which they were never intended. No longer are the mailings and travel considered essential or an integral part of the scheme; they are seen and used as mere technicalities which are necessary to obtain federal jurisdiction. Naturally, the public is pleased, and rightfully so, that corrupt public officials have been brought to book. But what of the prosecutor's responsibility to use the federal criminal laws only in a manner in which they were intended? Once the prosecutor determines that federal jurisdiction is lacking, his responsibility lies in cooperating with the state law enforcement officials and aiding the state in prosecuting the guilty. When he seeks convictions for crimes that are not within the federal jurisdiction, he acts irresponsibly and not in keeping with his high office. The court should not condone.

I would reverse.

Appendices to follow.